THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES GREEN, Defendant-Appellant.

First District (5th Division) No. 86—1019

Opinion filed November 14, 1988.—Rehearing denied March 10, 1989.

4

PINCHAM, J., dissenting.

Robert A. Egan, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Kim A. Novi, and Robert McNamara, Assistant State's Attorneys, of counsel) for the People.

JUSTICE MURRAY delivered the opinion of the court:

After a bench trial, defendant Charles Green was found guilty of four counts of murder, aggravated arson, residential burglary, home invasion, armed robbery, and four counts of armed violence. He was sentenced to natural life imprisonment in the Illinois Department of Corrections. On appeal, defendant argues: (1) he was improperly tried and sentenced as an adult; (2) the trial court erred in denying his motion to quash his arrest; (3) he was not proved guilty beyond a reasonable doubt; and (4) the trial court abused its discretion in refusing to allow the admission of evidence indicating that persons other than he committed the offenses for which he was charged. For the reasons set forth below, we affirm.

On January 12, 1985, police officer Joe Deases, in responding to a fire call, discovered the burned bodies of Raynard Rule, Lauren Rule, and Yvonne Brooks in a second-floor apartment located at 458 North Hamlin Avenue in Chicago. The victims had been gagged and their hands tied behind their backs, Raynard Rule had been stabbed, and Lauren Rule and Yvonne Brooks had been shot. Deases also found Kim Brooks outside of the apartment building. She told Deases that one of her assailants attempted to shoot her, the bullet missed her and she had managed to free herself and escape from the apartment after her assailants left. Brooks, who was severely burned, was rushed to a hospital for treatment, but subsequently died on February 16.

The events leading up to the deaths of the victims, according to defendant's grand jury testimony, consisted of the following. On January 12, at approximately noon, defendant, who was 16 years old at the time, met Derrick House in a "game room" at 750 North Lawndale in Chicago. Upon leaving the game room, defendant and House met Teddy Bobo. House and Bobo asked defendant if he would get Raynard Rule, whom defendant had known for three years, to open the burglar bars which were in front of the door to his apartment on the pretext that he wanted to buy some drugs. House gave defendant $25, defendant went to Rule's apartment, went up to the door by himself and knocked, Rule answered and asked defendant what he wanted, defendant said he wanted to buy a bag of cocaine

and told Rule he had $25 to pay for some, Rule opened the burglar bars, defendant stepped into the apartment, and immediately thereafter House and Bobo ran in after him. House grabbed Rule and put a pistol to his head and said something about money to him. House then took Rule to the kitchen while Bobo went into another room where three girls were sleeping on two mattresses. Bobo woke the girls up and tied them up with a brown extension cord. At that time defendant heard Rule yelling "No, no" in the kitchen. House came out of the kitchen shortly thereafter and went into the room where Bobo and the girls were. After talking with Bobo and the girls, House left the room, went back to the kitchen, and took Rule to a back bedroom, supporting him as they went. House then again went to the room where Bobo and the girls were, the girls "started to panicking [sic]" because they smelled smoke, which was coming from the back bedroom, and House told the girls not to worry about the smoke because the extension cord binding them was loose enough for them to free themselves and to get out of the apartment before it "started flaming." Immediately thereafter House shot one of the girls, Bobo shot another, and House shot the third girl. Kerosene was poured over the girls and ignited by Bobo. Defendant, who had been standing inside the doorway of the apartment throughout this time, then ran out and went to the game room on Lawndale. He subsequently met House in the game room and House told him he had stabbed Rule.

Following a police investigation, defendant was implicated in the Rule murders, taken to a police station on February 5, taken before a grand jury on February 6, subsequently charged with the crimes set forth above, found guilty after a bench trial, and sentenced to natural life imprisonment. This appeal followed.

Defendant first argues that the trial court lacked jurisdiction to try and sentence him as an adult. We find defendant's argument without merit. Section 2—7(6)(a) of the Juvenile Court Act (the Act) provides as follows:

"The definition of delinquent minor under Section 2—2 of this Act shall not apply to any minor who at the time of an offense was at least *15 years of age* and who is *charged with* murder, aggravated criminal sexual assault, armed robbery when the armed robbery was committed with a firearm, or violation of the provisions of subsection 24—1(a)(12) of the Criminal Code of 1961, as amended. These charges and all other charges arising out of the same incident shall be prosecuted pursuant to the Criminal Code of 1961, as amended."

(Emphasis added.) Ill. Rev. Stat. 1985, ch. 37, par. 702—7(6)(a).

Here, defendant was 16 years old at the time he was charged with the murders of the victims, as well as the other offenses arising out of the same incident. Defendant argues, however, that since he was convicted on a theory of accountability and did not directly participate in the crimes, section 2—7(6)(a) is inapplicable, *i.e.*, he in fact did not actually commit any of the crimes enumerated in section 2—7(6)(a), triggering application of that section.

■ It is well settled that the accountability statute (Ill. Rev. Stat. 1985, ch. 38, pars. 5—1, 5—2) makes both parties guilty as principals; the statute admits of no degrees. (*People v. Clark* (1986), 144 Ill. App. 3d 420, 494 N.E.2d 551, *rev'd on other grounds* (1987), 119 Ill. 2d 1, 518 N.E.2d 138.) Furthermore, the language of section 2—7(6)(a) provides for automatic trial of a defendant as an adult who is *charged with* the offenses enumerated in that section and who is at least 15 years of age at the time he *allegedly* commits those offenses. Therefore, whether a defendant is *charged with* those offenses on an accountability theory or otherwise is irrelevant; the fact remains that he is *charged with* the pertinent offenses, triggering application of section 2—7(6)(a).

■ We also reject defendant's similar argument with respect to the trial court's sentencing him as an adult. The pertinent section of the Act provides as follows:

"If after trial or plea the minor is only convicted of an offense not covered by paragraph (a) of subsection (6) of this Section, such conviction shall not invalidate the verdict or the prosecution of the minor under the criminal laws of this State, however the court must thereafter proceed pursuant to Sections 4—7 or 4—8. *In all other circumstances, in sentencing the court shall have available any or all dispositions prescribed for that offense pursuant to Chapter V of the Unified Code of Corrections and Article 5 of the Juvenile Court Act.*" (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(6)(c).)

Defendant again argues that he was not convicted of an offense covered by section 2—7(6)(a), *i.e.*, he insists that his convictions on an accountability theory are convictions for qualitatively different offenses. As indicated above, defendant, under an accountability theory, is deemed to be as guilty as a principal in committing the offenses charged and whether or not he directly participated in the crimes is irrelevant. Defendant was convicted of the offenses of

murder and armed robbery, among others, and thus subject to sentencing under the Unified Code of Corrections.

Defendant next argues that the trial court erred in denying his motion to quash his arrest, contending that his warrantless "arrest" was made without probable cause during an illegal entry of his home on February 5, his arrest and detention violated his fourth amendment rights and the Juvenile Court Act, and his testimony before the grand jury "should be deemed tainted and unable to provide probable cause for his arrest" on February 6 when he was officially charged by the police.

At the hearing on defendant's motion to quash his arrest, Detective John Summerville testified that pursuant to his investigation of the deaths of Raynard and Lauren Rule and Yvonne and Kim Brooks, he spoke to James Davis on February 3. Davis told Summerville that on January 11 he saw Rule and House get into an argument and fistfight over money; Rule "got the better of House" in front of a crowd which included House's girl friend. On January 12 at 11 a.m., he saw defendant and House at the Lawndale game room at which time they said they were going to "peep" or look for Rule, and later that evening he saw defendant, House and a boy named Virgil, who all had handguns and were smoking "happy sticks" (marijuana laced with PCP), and heard House say, "We got them, we got them, we just burnt Raynard." Summerville further stated that he subsequently identified Virgil as defendant's cousin, Virgil Bridges. Bridges later told Summerville that he had met defendant on January 12 at 7:30 p.m. and asked defendant what he "had done wrong," to which defendant responded that he had "gone up to Raynard's dope house with someone else and got Raynard to open the burglar gates" and, after the gates were opened, "things happened that were not suppose [sic] to happen," and that he also later overheard a conversation between defendant and House at the game room about opening burglar gates. Bridges subsequently gave Summerville defendant's address.

Summerville further testified, as did his partner Detective James Clemmons, that on February 5, at approximately 1 p.m., they went to defendant's apartment. They knocked on the door of the apartment, a young woman answered, they identified themselves as police officers and asked to speak to defendant, and they were allowed entry into the apartment. Summerville asked the male occupants in the room to identify themselves, defendant produced an ID, and Summerville asked defendant if he would come to the police station and answer some questions. Defendant stated that he wanted to get

dressed first and telephone his mother. Summerville told both defendant and his mother that defendant did not have to go to the station, and defendant accompanied the police to the station house. No force was used to gain entry to the apartment, neither officer displayed his weapon, they were in the apartment for approximately 15 minutes, they did not search the apartment, defendant was not handcuffed when he left the apartment with them, and no other occupants of the apartment were taken to the police station. At the station, defendant was not handcuffed, searched, fingerprinted or booked on any charge.

Defendant, in recounting the events of February 5, testified that three policemen, with their guns out, arrived at his apartment just as his sister was leaving, they rushed into the open door of the apartment, and they began searching the apartment. Defendant asked a police officer if he had a warrant and was told to shut up. He further stated that the police remained in the apartment for 1½ hours, he was taken from the apartment to the police station in handcuffs, as were his brother and cousin, the police told him he was under arrest, and he was photographed at the station house.

Gloria Thompson, defendant's sister, testified differently only to the extent that she telephoned her mother, one police officer had his gun out, one officer searched the apartment while the other two spoke to defendant's brother and cousin, the police officers never threatened anyone while they were in the apartment, and the officers only remained in the apartment for 20 to 30 minutes. Terry Green, defendant's brother, and Willie Thomas, defendant's cousin, similarly testified on these points.

Viola Green, defendant's mother, testified that on February 5 she received a telephone call from her daughter Gloria Thompson. Thompson said police were at her house "getting" defendant, Terry Green and Willie Thomas and searching the house. She went to the police station and spoke to Sergeant John Regan at 1:30 p.m., asked to see defendant, and Regan refused her request. She stayed at the station for approximately 45 minutes longer, then left.

With respect to the time of defendant's arrest, Detective James Clemmons acknowledged that an arrest report, with his name on it but which he did not prepare, indicated February 5 at 1 p.m. as defendant's time of arrest. Detective Michael Miller testified that he saw defendant at the police station on February 5, he was not under arrest, restricted or charged with any crime, and he formally arrested defendant on February 6 after defendant testified before the Cook County grand jury. Miller also acknowledged on cross-examina-

tion that an arrest report with his name on it indicated defendant's time of arrest at 1 p.m. on February 5. Assistant State's Attorney John O'Donnell testified that on February 6 no charges had been lodged against defendant prior to his testimony before the grand jury. On cross-examination, however, O'Donnell acknowledged preparing a "Form 101" prior to defendant's appearance before the grand jury, which indicated February 5 as defendant's date of arrest.

The trial court subsequently found that defendant's arrest occurred at 1 p.m. on February 5, that probable cause for his arrest existed at that time, and that the police had consent to enter his apartment. Accordingly, the court denied defendant's motion to quash his arrest.

■ It is well settled that probable cause to arrest an individual exists where, when viewed objectively, the situation confronting the arresting officer, as well as the facts known to him, are such as would cause a person of reasonable caution to believe that the individual to be arrested had committed a crime, bearing in mind that probabilities are involved, not proof beyond a reasonable doubt. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.) A reviewing court will not disturb a finding of probable cause to arrest unless it is manifestly erroneous. (*People v. Philson* (1979), 71 Ill. App. 3d 513, 389 N.E.2d 1223.) A warrantless arrest based on probable cause may be made in an individual's home if the police have consent to enter. *People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140.

Here, defendant merely asserts but does not argue with specificity that the police did not have probable cause to arrest him. Instead, his probable cause argument appears to be premised on his contention that his arrest was illegal because he did not give the police his consent to enter his home.

■ On the other hand, the State argues that probable cause existed based on information obtained from James Davis and Virgil Bridges, defendant's cousin. James Davis told the police he saw defendant and House at the game room and heard them say they were going to look for Rule and, later that evening while defendant, House and Virgil Bridges were together, he heard House say, "We got them, we got them, we just burnt Raynard." Davis also stated that all three men had handguns at the game room and began smoking "happy sticks." Virgil Bridges, defendant's cousin, corroborated much of Davis' statement to the police. Bridges told Detective Summerville that defendant told him he had "gone up to Raynard's dope

house with someone else and got Raynard to open the burglar gates" and "things happened that were not suppose [*sic*] to happen." We find the obvious inference to be drawn from this information by any reasonable person is that defendant and House had participated in the shootings and fire at Rule's apartment on January 12. Accordingly, we hold that the trial court's finding of probable cause to arrest defendant was not against the manifest weight of the evidence.

■ We also reject defendant's argument that the police entered his apartment without his consent. Although the testimony of the police and defendant's witnesses contradict each other, it was within the province of the court to determine the credibility of the witnesses and the weight to be accorded their testimony to resolve the inconsistencies and conflicts therein. (*People v. Washington* (1984), 125 Ill. App. 3d 109, 465 N.E.2d 666.) Based on the record before us, we cannot say that its determination was erroneous. While Detectives Summerville and Clemmons similarly testified that they knocked on the door, did not have their guns drawn, did not use force in entering defendant's apartment, and defendant consented to their entry, there were discrepancies in the testimony of defendant's witnesses with respect to the number of police in and out of the apartment, the number of officers who had their guns drawn, the amount of time the police remained in the apartment, and who was handcuffed to whom. Apparently the trial court determined the two police officers were more credible than defendant and his witnesses. Since the court was in a better position to judge the credibility of the witnesses, we see no reason to disturb its determination that the police entered defendant's apartment with consent.

Defendant next argues that his arrest on February 5 and his alleged subsequent 27-hour detention at the police station violated his rights under the fourth amendment and the Juvenile Court Act. He first contends that he was illegally restrained at the police station for 27 hours under "unknown circumstances" prior to being charged, was not represented by counsel during that time and was "cut off" from his family. Accordingly, he asserts that a statement made by him after 10 hours "in custody" and his testimony before the grand jury 17 hours later were the products of physical and psychological coercion.

■ It is well settled that an arrest involves three elements: intention of the officer, understanding of the arrestee, and restraint of the person. (*People v. Fulton* (1979), 68 Ill. App. 3d 915, 386 N.E.2d 605.) The test of an arrestee's understanding is whether an inno-

cent, reasonable man would have thought himself under arrest. *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.

Here, notwithstanding the fact that the time of defendant's arrest is disputed, the record is clear that he was not handcuffed, fingerprinted, or charged while at the police station until after his testimony before the grand jury on February 6. Detective Miller testified that defendant was "in custody" but that meant merely that "he was in the police presence in a police facility." Miller further testified that he and Summerville told defendant he was free to leave but that defendant stayed overnight at the station in the interview room. John Regan testified that defendant was "in custody" but that meant only that he was in the area of the station.

On the other hand, defendant only asserted he was photographed but does not cite to the record evidence in support thereof. Defendant also does not argue in his brief or cite to the record evidence supporting his contention that he was not free to leave the station house, *i.e.*, he failed to account for his whereabouts during the 27 hours or allege any specific conduct by the police barring his freedom to leave. Defendant also only states that his mother asked to see him when she initially came to the station at 1:30 p.m. on February 5 and her request was denied; defendant does not allege that his mother asked to see him again and that her request was denied over the alleged 27-hour period of illegal detention.

■ It is well settled that an appellant is responsible for providing a record which shows the errors claimed; where the record is incomplete, or is silent, a reviewing court will invoke the presumption that the trial court ruled or acted correctly. (*People v. Hamilton* (1978), 64 Ill. App. 3d 276, 381 N.E.2d 74.) Defendant clearly has failed to support his claim that he was illegally restrained.

■ We further observe that defendant was familiar enough with police procedure to ask the police if they had a warrant to enter his apartment. He further testified that at the police station he was neither searched nor fingerprinted. Defendant also had previous involvement with police procedure given the fact that a delinquency petition was filed against him stemming from an alleged battery. Defendant was interrogated on February 5 for a total of approximately three hours during which time he was in and out of the interview room. The unrebutted testimony of the State's witnesses indicates that defendant left the interview room to use the washroom facilities and to get something to eat. Defendant never complained of being mistreated and in fact stated before the grand jury that he had been treated well by the police; no threats or promises were

made by the police.

Based on the evidence presented, therefore, we cannot say that defendant should have reasonably believed he was under arrest and not free to leave the station.

■ Defendant also argues that his arrest violated the provisions of the Juvenile Court Act because the police failed to contact his mother and to promptly take him before the court as a juvenile in custody. We first observe that even if the police did not talk directly to defendant's mother by telephone, Mrs. Green testified that shortly after the police entered defendant's apartment her daughter spoke to her at that time and told her the police were "getting" defendant. Secondly, we note that section 3—2(2) of the Act, which defendant relies on as requiring notification of the parents of juveniles, does not apply to defendant's situation. The pertinent part of that section provides:

> "A law enforcement officer who takes a minor into custody without a warrant under Section 3—1 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care, *** that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." (Ill. Rev. Stat. 1985, ch. 37, par. 703—2(2).)

Section 3—1, referred to above, applies to minors who are believed to be delinquent or who have escaped from any court-ordered commitment or who are sick or injured in a public place. (Ill. Rev. Stat. 1985, ch. 37, par. 703—1.) Moreover, based on our above discussion, we have determined that defendant was not taken into custody, but rather went to the police station on his own volition to answer questions. In addition, defendant was taken to the station based on his suspected involvement in four murders and therefore was subject to the jurisdiction of the criminal courts, not the juvenile courts. See *People v. Visnack* (1985), 135 Ill. App. 3d 113, 481 N.E.2d 744.

Defendant's last argument on this issue is that no probable cause existed to arrest him on February 6 because his statements to Assistant State's Attorney O'Donnell and before the grand jury on that day were not made voluntarily. In support thereof, defendant repeats his argument that he was physically and psychologically co-

erced into making the statements as a result of his 27-hour detention during which he was isolated from his family and the court.

Because we have determined that probable cause existed to arrest defendant on February 5, we need only address the voluntariness of defendant's statements on February 6. "The test of whether a confession was admissible at trial is whether the [State] met its burden of showing that the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether defendant's will was overcome when he made the statement." (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 401, 495 N.E.2d 984.) In making this determination, the court must consider the totality of the circumstances surrounding the making of the statement, including the existence of any threats, promises, or physical coercion, the length and intensity of the interrogation, and the age, intelligence, experience, and physical condition of the defendant. The court's determination will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *Stachelek*, 145 Ill. App. 3d at 401.

Here, defendant stated in his grand jury testimony that he was given *Miranda* warnings on February 5 and that they were repeated again at the grand jury hearing, he admitted neither the police nor the State's Attorney made any threats or promises to him and never hit or did anything to scare him, and that the police treated him well throughout the time he was at the station house. We further observe that defendant never complained about being mistreated. There is no evidence that defendant was subjected to lengthy periods of interrogation or that he was denied sleep, food or access to a washroom. Nor was any affirmative evidence presented showing that coercion was used to get defendant to appear before the grand jury. Additionally, various police officers and assistant State's Attorneys testified that defendant's movement was not restricted and that he was treated well throughout his stay at the police station. In considering the totality of the circumstances, therefore, we cannot say that the trial court's determination that defendant's statements on February 6 were voluntary was against the manifest weight of the evidence.

In light of the foregoing, we hold that the trial court properly denied defendant's motion to quash his arrest.

Defendant next argues that he was not proved guilty beyond a reasonable doubt based on accountability, nor was his guilt established beyond a reasonable doubt because his grand jury testimony was contradicted by other evidence. He first contends that no evi-

dence was presented that he encouraged House or Bobo by word, gesture or deed to commit any of the specific offenses for which he was subsequently held accountable, there was no evidence that House and Bobo revealed their true intent to him, and he did not actually participate in any of the specific offenses and therefore cannot be held accountable.

A person is legally accountable for the conduct of another when, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 5—2.) Evidence that a defendant voluntarily attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, makes him criminally liable for any wrongdoings committed by the other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof, even though he did not actively participate in the overt act itself. (*People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 483 N.E.2d 944.) Proof of a common purpose need not be supported by words of agreement but can be drawn from circumstances surrounding the commission of an act by a group. *People v. St. Pierre* (1975), 25 Ill. App. 3d 644, 324 N.E.2d 226.

Here, the common purpose of defendant, House and Bobo was to illegally enter Rule's apartment while he was at home to force him to turn over money he otherwise refused to pay to House. This unauthorized entry with the intended use of some force (home invasion) is the offense which is the basis of finding defendant accountable for the other offenses committed in furtherance of the purpose for the unauthorized entry. Defendant's role in the home invasion was integral to its success and clearly he intended to promote or facilitate the commission of that offense by pretending to buy cocaine from Rule so that House and Bobo could gain entry into the apartment they could otherwise not lawfully enter. Obviously defendant knew a conflict existed between Rule and House, based on the necessity of using him to get Rule to open the protective burglar gates, and that that conflict could result in the use of force against Rule.

We further observe that in determining whether accountability has been established, the trier of fact may consider factors such as defendant's presence without disapproving or opposing the

commission of the crime, a continued close affiliation with the codefendants after the commission of the crime, the defendant's failure to report the incident or confide in anyone about it (*People v. Watson* (1982), 106 Ill. App. 3d 315, 436 N.E.2d 7), and the defendant's flight from the scene (*People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285).

In the instant case, defendant initially made a statement that he remained in the hallway near the front door rather than in the apartment while the subsequent crimes were being committed. This statement was contradicted by his testimony before the grand jury that he had originally lied and in fact had been in the apartment near the entryway. On appeal, he also contends that he was prevented from fleeing the scene because the burglar gates had been locked again and he knew of no other exit. At the same time, however, defendant recited in his various statements that he was close enough to the events to hear the argument over money with Rule and his codefendants' later questioning of the three girls concerning money and where "dope" might be hidden. He also was able to observe Bobo enter the bedroom where the girls were sleeping and see him tieing them up with a brown extension cord. Later, when there was evidence of smoke in the apartment, defendant heard Bobo tell the girls not to panic because the extension cord binding them was loose enough for them to free themselves and get out of the apartment. Defendant further saw House and Bobo shoot the girls, pour kerosene over them, and ignite the kerosene. Accordingly, we find it incredible, as apparently did the trial court, to believe that defendant could have described these events had he been positioned in the hallway outside the apartment. Logically then, having been in the apartment, the burglar gates could not have been locked when he fled the scene, notwithstanding the fact that they were locked when the fire department arrived and had to be torn away from the wall.

We also observe that at no time did defendant attempt to disapprove or oppose the actions of House and Bobo; he remained to view all of the crimes and only then did he flee to the Lawndale game room where he met House and discussed details of the crime with him and smoked "happy sticks." Defendant did not contact the police and he later initially denied his participation in the occurrence. In the absence of any evidence that defendant detached himself from the criminal enterprise (see *People v. Rybka* (1959), 16 Ill. 2d 394, 158 N.E.2d 17), defendant was accountable for the conduct of House and Bobo after his initial action in getting Rule to open the burglar gates.

We similarly reject defendant's argument that he was not proved guilty beyond a reasonable doubt because of conflicts between his grand jury testimony and other evidence. In support of this contention, defendant again argues he remained in the hallway during the occurrence. He also appears to argue that the burglar gates were locked so he therefore could not have been in the apartment. He further contends that a conflict existed based on Kim Brooks' statement that she only saw two men in the apartment, thereby strengthening his argument that he did not enter the apartment.

 Where inconsistencies and conflicts exist in the evidence, the trier of fact has the responsibility of weighing the credibility of the witnesses and resolving these conflicts and inconsistencies. (*People v. Torres* (1981), 100 Ill. App. 3d 931, 427 N.E.2d 329.) We find, as apparently did the trial court, that any number of reasons could explain why Brooks only saw two men. For example, defendant could have been out of her line of vision or she only focused on House and Bobo, with whom she was in direct contact. Similarly, the burglar gates could have been locked by any one of the defendants upon leaving the apartment. On the other hand, we do not find the State's evidence improbable, unconvincing, or contrary to human experience. (See *People v. Scott* (1982), 108 Ill. App. 3d 607, 439 N.E.2d 130.) In light of the foregoing, therefore, we cannot say that the evidence is so unsatisfactory as to raise a reasonable doubt of guilt.

Defendant's final argument is that the trial court erred in refusing the admission of evidence as hearsay that the offenses were committed by other persons. Specifically, he contends that the testimony of Sterling Buchanon implicated another party and his alleged accomplice as the perpetrators of the crimes and the court improperly excluded certain statements made by Kim Brooks at the hospital which supported this theory.

In Illinois, the general rule is that an extra-judicial declaration not under oath by the declarant that he, and not the defendant on trial, committed a crime is inadmissible as hearsay notwithstanding the declaration is against the declarant's penal interest. An exception to this rule exists where the statement is supported by sufficient indicia of trustworthiness. (*People v. Bowel* (1986), 111 Ill. 2d 58, 488 N.E.2d 995.) The trustworthiness of such a declaration can be determined by consideration of whether the statement was spontaneous and occurred shortly after the crime, the statement was corroborated by other evidence, the statement was self-incriminating and a declaration against penal interest, and there was an adequate

opportunity for cross-examination of the declarant. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) The admission of evidence is within the sound discretion of the trial court and its ruling will not be reversed absent a clear showing of abuse of that discretion. *People v. Bowel* (1986), 111 Ill. 2d 58, 488 N.E.2d 995.

At trial, defendant made an offer of proof that Sterling Buchanon would testify to certain statements made by his brother, Jeffrey Hagans, also known as "Bodine." Buchanon stated that on January 16, 1985, he was with Bodine and some friends and asked Bodine if he knew anything about the "Hamlin crimes," and Bodine responded "[T]he less you know the better off you is"; that he overheard Charlie Hill, a friend of Bodine's, tell Bodine that he "[B]etter get rid of the clothes because [he] throwed that shit everywhere. It got on me, on my pant, my shoes, everything"; that he saw Bodine burn a "roll of clothes"; that Hill told Bodine that "You should have called the nigger back upstairs, cause he could put us in the building"; that in response to Buchanon's statement to Bodine that Hill had too much influence over him and the Hamlin crimes did not "make any sense," Bodine responded that "it just didn't go the way we planned"; that at a later time Buchanon showed Bodine a photograph of his brother-in-law's girlfriend, who Buchanon learned was one of the victims and Bodine said she was "one of the bitches with Raynard" and that "that bitch shouldn't have been up there"; and that at another time Buchanon overheard a conversation between Bodine and Hill in which Hill remarked to Bodine that "You know that bitch is still alive," to which Bodine responded, "Don't worry about it, she in a coma" and told Hill to "keep tabs on the broad," and Hill responded that "she the only one can identify us" and "if worse come to worse, we will go up in the hospital and get her." The trial court refused admission of these statements as hearsay.

Defendant also contends that Kim Brooks' statements to Detective Thomas Blomstrand approximately two hours after being taken to the hospital corroborates Buchanon's proffered testimony, *i.e.*, she identified Bodine as one of the two men responsible for the incident at the Rule apartment and described the other offender as being approximately 5 feet 7 inches (allegedly Hill). The court refused admission of Blomstrand's testimony as to these statements as not falling under the spontaneous declaration exception to the hearsay rule.

We agree with the trial court that Buchanon's and Blomstrand's testimony was inadmissible as hearsay. Neither Bodine nor Brooks was available for cross-examination; both died prior to trial.

Although Buchanon's testimony would have been against his penal interest, presumably because in making his statement in court he admitted smoking marijuana and stripping a stolen car, the very fact that he was smoking marijuana and "getting high" when he initially overheard Bodine's and Hill's alleged references to the Rule murders casts doubt on their trustworthiness. We further observe that nothing in Bodine's alleged statements to Buchanon contained any specifics about the crime and no direct admission by Bodine that he in fact committed the offenses. The only corroborating evidence was Donald Grigsby's testimony that he saw Bodine and another man who was 5 feet 7 inches on the stairs of the apartment building on the date of the crimes, but that is not proof that Bodine was the perpetrator of the crimes. On the other hand, defendant confessed to his participation in the incident in accurate detail before the grand jury, and House subsequently corroborated his testimony in the same detail. In addition, James Davis and Virgil Bridges both implicated defendant as a participant in the incident. Buchanon's offered testimony thus was not only uncorroborated but it lacked trustworthiness because of its sheer implausibility in light of defendant's and House's confessions.

■■ Similarly, we reject defendant's contention that Kim Brooks' statements to Detective Blomstrand were admissible under the spontaneous declaration exception to the hearsay rule. At 6:15 p.m. on the date of the Rule incident, Detective Joe Deases spoke with Kim Brooks prior to her being taken to the hospital. Her version of the events leading up to the crimes corresponded with defendant's and House's subsequent accounts, but she did not identify her assailants at that time. After arriving at the hospital, Detective Blomstrand spoke with Brooks at approximately 8:30 p.m. During her interview with him, she stated that one of the assailants was 5 feet 7 inches and she referred to another offender as "Bo" or "Boo." Blomstrand later acknowledged that he had written the name Bodine at least once in his report but that in fact Brooks had not named one of the assailants as Bodine; Blomstrand apparently had become aware of the name of Bodine during his investigation.

■■ In order for a statement to be admissible as a spontaneous declaration, there must be (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) absence of time to fabricate, and (3) the statement must relate to the circumstances of the occurrence. (*People v. Sanchez* (1982), 105 Ill. App. 3d 488, 434 N.E.2d 395.) The spontaneous declaration exception "is based upon the experience that, under certain external circum-

stances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." *People v. Poland* (1961), 22 Ill. 2d 175, 180-81, 174 N.E.2d 804, quoting 6 J. Wigmore, Evidence §1747 (3d ed. 1940).

Here, Brooks' statements to Blomstrand were made at least two hours after being taken to the hospital. At that time she was alert, responsive and speaking without trouble, unlike her condition when she first spoke to Detective Deases and related the events leading up to that time but did not name anyone as her assailants. At the least, Brooks had time at the hospital to reflect on who her assailants were. We further observe that even assuming Brooks' hospital statements had been admitted, she clearly referred to one assailant as "Bo" or "Boo," but specifically not "Bodine," and could have been referring to Teddy Bobo. In addition, her statements corroborated defendant's confession in all other respects. With respect to her description of one of the offenders being 5 feet 7 inches, this point would have carried little weight in light of defendant's and House's confessions as discussed above. Accordingly, we find the trial court did not abuse its discretion in refusing to admit the hearsay statements of Buchanon and Blomstrand.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ, P.J., concurs.

JUSTICE PINCHAM, dissenting:

I

I dissent. For police officers, without a warrant, to enter a home and arrest an American citizen, particularly a 16-year-old boy

in the absence of his parents, without probable cause as the State was compelled to urge in the trial court, or with probable cause as the State is compelled to inconsistently and diametrically urge on appeal before this court, take the juvenile from his home and voluntarily or involuntarily detain him incommunicado in a police station for over 27 hours, refuse the juvenile's mother's request to see the child, take the juvenile before a grand jury, where and without counsel on his behalf, the prosecutor extracts an incriminating statement from him, on which that grand jury indicts him and which is the only evidentiary basis for his murder convictions, constitute flagrantly egregious violations of the juvenile citizen's cherished, revered and basic Federal and State constitutional rights to (1) due process of law, (2) to be secure in his person and home against unreasonable search and seizure, (3) to the assistance of counsel, (4) not to be compelled to be a witness against himself, and (5) against self-incrimination, notwithstanding the egregiousness of the offenses with which the defendant was charged, convicted and sentenced to life imprisonment.

The record on appeal reflects that the People of the State of Illinois were represented at a 4 p.m., February 6, 1985, meeting, called "to discuss the fact whether Mr. Green was in fact a witness or a participant in the murders that occurred in that apartment," by at least four lawyers of considerable talent and experience, Assistant State's Attorneys Dennis Dernback, Timothy Quinn, Tom Brennan and John O'Donnell, who had, in addition, the majesty and power and authority of a grand jury literally at their collective elbow. Arrayed against all this talent and power was one uncounseled, unadvised 16-year-old boy who had spent 27 continuous hours in police custody and who had been denied the request during that time to see his mother. The fact that this young lad had been denied access to his family obviously preyed upon the defendant's mind at the grand jury because he testified at the grand jury that the night before he had given a statement to an assistant State's Attorney and a court reporter in the police station and that that statement contained lies. After being questioned about this prior statement before the grand jury the following then occurred:

"Q. (by Assistant State's Attorney O'Donnell at the grand jury) And now you're telling the truth today?

A. Yes.

Q. Why are you telling the truth today?

A. *Because I want to be with my family.*" (Emphasis added.)

This answer, that he was telling the truth at the grand jury *"because I want to be with my family"* (emphasis added) from a 16-year-old boy, under these circumstances, is a *prima facie* indication that his testimony had been coerced. Something happened while the defendant was in police custody which caused him to change his story with respect to the homicides, and it obviously related to his deprivation from his family. From the totality of the hereinafter mentioned facts and circumstances, the later set forth testimony of Assistant State's Attorney John O'Donnell regarding why he took the defendant before the grand jury and the defendant's answer before the grand jury, *"because I want to be with my family,"* (emphasis added) it is quite apparent to me that the defendant was of the frame of mind that because of and upon the conclusion of his grand jury testimony he would be allowed to return home to his family.

His answer troubled at least one grand juror, who asked the defendant:

"A JUROR: *He made a statement that he want [sic] to be with his family. Will you explain what he meant by what he want [sic] to be with his family or how is this working?*

MR. O'DONNELL: Charles, did you tell me that the reason you're telling the truth is because you wanted to *protect your family?*

A. Yes.

Q. Is that the reason why you're telling the truth today?

A. Yes.

Q. Have I made any promises to you?

A. No.

Q. Have I made any threats to you?

A. No.

A JUROR: How did you find Charles?

MR. O'DONNELL: I couldn't tell you that.

A JUROR: He just came?

MR. O'DONNELL: *There was a police investigation. Charles was picked up as a result of that police investigation."* (Emphasis added.)

Thus, when the juror asked about the defendant wanting *"to be with his family"* Assistant State's Attorney O'Donnell diverted the trajectory of the grand juror's question by suggesting that the defendant *"wanted to protect"* his family. (Emphasis added.) The defendant's desire *"to be with his family,"* the words of the defendant and the grand juror, and *"to protect his family,"* (the words of Assistant State's Attorney O'Donnell), which are not the same thing.

(Emphasis added.)

Assistant State's Attorney O'Donnell's zeal before the grand jury to immediately extricate himself from any possible accusation of skullduggery is glaringly apparent. Promptly after the grand juror asked him to explain what the defendant meant when he said that he had testified before the grand jury because *he wanted to be with his family*, and O'Donnell's successful sidetracking and redirecting the defendant's statement and the grand juror's inquiry about it, O'Donnell hastily asked the defendant, "Have *I* made any promise to you?" and, "Have *I* made any threats to you?" (Emphasis added.) I find it extremely significant that this experienced astute prosecutor did not likewise ask this minor defendant if *any other prosecutor or law enforcement officer* had made any promises to him or had threatened him, in order to also eliminate any possible charges of chicanery against them.

It is indeed noteworthy that, according to the grand jury testimony of the defendant Charles Green, he was simply the decoy who persuaded Raynard Rule to open the burglar gates to enable Derrick House and Teddy Bobo to gain entrance into the apartment, where House and Bobo actually committed the four atrocious murders, in which the defendant Charles Green did not actually or actively participate. Thus, at best, defendant Charles Green was merely an accessory and only accountable for the murders, while House and Bobo were the principal offenders, and all three were charged in the indictment with the murders. Yet, the record reflects, Teddy Bobo was not prosecuted for the murders because, on motion of the State, the trial court nol-prossed the indictment against him, whereas, in a bench trial severed from the trial of the defendant Charles Green, Derrick House was found guilty of the murders and sentenced to death. Derrick House's sentence being death, his appeal was directly to and is now pending before the supreme court of Illinois. From the entire record before us on appeal, it could be argued with a great degree of persuasion that the law enforcement officers' interactions with the defendant, Charles Green, were initially designed to coerce him into being a witness against Derrick House and Teddy Bobo, and when that failed, for reasons which do not appear, the law enforcement officers then prosecuted the defendant for the crimes and used his illegally obtained grand jury testimony as the evidence to convict him.

It is clearly borne out by Assistant State's Attorney John O'Donnell's testimony on the hearing of the defendant's motion to suppress his grand jury testimony:

"Q. (By defense counsel) Prior to Mr. Green testifying in front of the Grand Jury, you had spoken with him, had you not?

A. Yes, sir.

Q. And you talked with him about everything he in fact testified to in front of the Grand Jury; is that correct?

A. Yes, sir.

Q. He told you nothing new in front of the Grand Jury; is that correct?

A. No, sir.

Q. What did he tell you new in front of the Grand Jury?

A. *He didn't tell me anything new in front of the Grand Jury.*" (Emphasis added.)

The final proof, if any were needed, that this scheme was deliberate and purposeful came from Assistant State's Attorney O'Donnell's testimony later *at the trial* when the denouement of the stratagem was revealed:

"Q. *Now, why did you put Mr. Green in front of the Grand Jury after you interviewed him?*

A. There were two reasons. One was I was waiting for a youth officer at that time—well, that is not a reason but I was waiting for a youth officer. The youth officer was late and the time was late. It was time that the Grand Jury was leaving. I put him in the Grand Jury because we believed—*we were going to discuss the fact whether Mr. Green was in fact a witness or a participant in the murders that occurred in that apartment.*

Q. Is it not a fact, Mr. O'Donnell, that you wanted to commit Mr. Green's testimony to writing in front of a charging authority, the Grand Jury?

A. *I wanted his statement to in effect be in writing since he had given a prior inconsistent statement the night before.*

Q. You could have brought a court reporter in to do that, couldn't you?

A. I could have brought in a court reporter, yes.

* * *

Q. Mr. O'Donnell, these events that you have testified to here today took place approximately 11 months ago, is that correct?

A. That's correct.

Q. How many cases have you been responsible for handling in those 11 months?

A. I have been responsible for quite a few cases.

Q. Hundreds?

A. Well, it depends what you mean responsible for, whether you mean responsible for trial or responsibility for putting someone before the Grand Jury.

Q. How many investigations, indictments, informations, complaints, charges or the like have you handled in the last 11 months?

A. I have probably been responsible for hundreds of cases for trial or motions. *This probably was one of the only cases that I in fact put a defendant in before the Grand Jury."* (Emphasis added.)

I am impelled to briefly comment, first, upon the horrible state of the record on appeal, filed in this court, and, second, upon the grossly inadequate and incompetent performance of defendant's counsel.

According to the common law record, there was testimony heard on the motion to quash arrest and to suppress evidence on January 7, 8 and 10, 1986, and on January 13, 1986, the court denied the motions. On January 17, 1986, the defendant's bench trial commenced. Testimony was heard thereafter on January 21, 22, 23, 24, 27, 28, 29, 1986; closing argument was heard on January 31, 1986, and on February 4, 1986, the trial court found the defendant guilty. The record on appeal does not contain any report of proceedings *at all* for January 27. The report of proceedings for January 31, 1986, is physically inserted between the reports of proceedings for April 1, 1986, and February 4, 1986. As to the January 21, 23, 24 and 29 trial dates, the report of proceedings contains only partial or "excerpted" trial proceedings and, naturally, there is no way of knowing the relative importance or unimportance of the missing trial proceedings. In addition, the report of proceedings ("excerpted" or otherwise) is bound in nonsequential misorder. For example, Volume I begins with the report of proceedings for May 7, 1986, followed by January 7, 1986, and next, followed by January 17, 1986. One must refer to the "Supplemental Record," another volume (Volume III), for the intervening report of proceedings for January 8, 9, 10, and 13 (excerpted only), and then back to Volume I for the report of proceedings for January 21 (excerpts only), January 22, 23 (excerpts only), January 24 (excerpts only), and January 28, 1986. One then proceeds to Volume II for the proceedings of January 29, 1986, and returns to the "Supplemental Record" (Volume III) for the February 4, 1986, guilty findings of the trial court, only to find that the same

appears inserted into Volume III *after* the sentencing proceeding on April 1, 1986. In addition, the record on appeal nowhere contains the defendant's motion to quash arrest and to suppress evidence, the very matter upon which the defendant places primary reliance in his brief for reversal in this court. Likewise missing are most of the exhibits admitted into evidence on the hearing of the motion to suppress and considered by the trial court in ruling thereon.

Now, certainly none of the insufficiency of the record on appeal is attributable to the defendant personally, a teenager in the penitentiary and who is compelled to exclusively rely upon appointed counsel on appeal. The majority points out (179 Ill. App. 3d 12) that it is the responsibility of appellant's counsel to provide the court with a complete and orderly record on appeal so that we may accurately discharge our obligations to the parties and to the public. True. But this should rightly create an obligation *on this court*, not serve as an excuse *for this court* to affirm a conviction. It is our duty to see to it that the obligations of the appellant's counsel are properly fulfilled. We are required in this case to render a decision which determines the remainder of the entire life of the defendant, and we are asked by *defendant's own counsel* to make this serious and awesome determination on the basis of partial transcripts, excerpted proceedings, and missing documents. In my judgment, this constitutes dereliction of duty and incompetence by defendant's counsel in its grossest and rawest form.

In addition, the brief filed on behalf of defendant is, in my judgment, woefully inadequate and disorganized. For instance, the brief cites very little pertinent testimony, abandons the *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, issue specifically relied upon by the defendant below, fails to point out the utter confusion and contradictions of the trial court's findings and conclusions at the motion to quash and suppress hearing, and pays but scant heed to the propriety of the State's eliciting self-incriminating testimony from an uncounseled juvenile arrestee before the same grand jury which subsequently indicted him, and the State's introduction of that same testimony at the defendant's trial to convict him. In addition, nearly one-third of defendant's 52-page brief (pages 2 through 17), purports to quote defendant's testimony before the grand jury on February 6, 1985. However, the transcript of the defendant's testimony before the grand jury which was introduced into evidence at the trial as People's exhibit No. 27 is not a part of the record on appeal. This court therefore has no way of determining whether the quotation in the defendant's brief is accurate or

complete. Except for the two short paragraphs preceding the defendant's supposed grand jury testimony, and one short paragraph following it, the defendant's supposed grand jury testimony constitutes the *entire* "Statement of Facts" in the defendant's brief. Moreover, and at least equally important, the defendant filed no reply brief in this court and thus totally abstained from thereby bringing to this court's attention the misrepresentations of certain motion to suppress testimony set forth and relied upon by the State in its brief, as well as the impropriety of the State's urging a position in this court exactly contrary to that which the State urged in the trial court.

It is now well established that a defendant on direct appeal has a sixth amendment constitutional guarantee to competent counsel on appeal. (*Penson v. Ohio* (1988), 488 U.S. ___, 102 L. Ed. 2d 300, 109 S. Ct. 346; *McCoy v. Court of Appeals of Wisconson, District 1* (1988), 486 U.S. 429, 100 L. Ed. 2d 440, 108 S. Ct. 1895; *Evitts v. Lucey* (1985), 469 U.S. 387, 83 L. Ed. 2d 821, 105 S. Ct. 830.) It is also now well established that an appellate court has an independent constitutional *obligation* to examine the record on appeal for completeness and a criminal defendant's brief for competence of counsel on appeal. (*Penson v. Ohio*, 488 U.S. ___, 102 L. Ed. 2d 300, 109 S. Ct. 346.) This court has been repeatedly admonished—see, *e.g., People v. White* (1987), 117 Ill. 2d 194, 228; *United States ex rel. Thomas v. O'Leary* (7th Cir. 1988), 856 F.2d 1011—that a decision by this court adverse to a criminal defendant without a brief having been filed on behalf of such defendant violates the defendant's sixth amendment right to counsel. Surely no different rule prevails where the defendant's counsel files an inadequate brief. No longer is a court of review permitted to sweep a defense counsel's defective representations under the rug with a rationalization: "It is well settled that an appellant is responsible for providing a record which shows the errors claimed; where the record is incomplete, or is silent, a reviewing court will invoke the presumption that the trial court ruled or acted correctly." (179 Ill. App. 3d at 12.) The sixth amendment makes no distinction between appointed and retained counsel. In *McCoy v. Court of Appeals of Wisconsin, District 1* (1988), 486 U.S. 429, 100 L. Ed. 2d 440, 108 S. Ct. 1895, Justice Stevens recently stated for the court:

> "Every advocate has essentially the same professional responsibility whether he or she accepted a retainer from a paying client or an appointment from a court. The appellate lawyer must master the trial record, thoroughly research the law,

and exercise judgment in identifying the arguments that may be advanced on appeal. In preparing and evaluating the case, and in advising the client as to the prospects for success, counsel must consistently serve the client's interest to the best of his or her ability." 486 U.S. at ____, 100 L. Ed. 2d at 453, 108 S. Ct. at 1902.

"The attorney must still provide his or her client precisely the services that an affluent defendant could obtain from paid counsel—a thorough review of the record and a discussion of the strongest arguments revealed by that review. In searching for the strongest arguments available, the attorney must be zealous and must resolve all doubts and ambiguous legal questions in favor of his or her client." 486 U.S. at ____, 100 L. Ed. 2d at 457, 108 S. Ct. at 1905.

No citizen should be imprisoned for life simply because his *appointed* counsel was incompetent, either at trial or on appeal, or at both. When the State of Illinois appoints counsel for an indigent it warrantees that the counsel possesses certain *minimum* standards. These minimum standards should include at least the following: That counsel file in the court of review (1) a complete, accurate and sequential report of proceedings; (2) a complete and accurate original or copy of all relevant motions filed in the trial court; (3) a statement of all issues litigated in the trial court and not·raised on appeal, together with a short statement explaining why these issues have not been raised on appeal; and (4) a brief filed in accordance with the supreme court rules. Only then will a conscientious court of review be able to assure itself that the defendant's sixth amendment guarantee to competent representation and the fourteenth amendment guarantees to due process of law and the equal protection of the laws, as well as the corresponding State constitutional guarantees, have been fully enforced as to the humblest citizen convicted of even the most heinous crimes. As Mr. Justice Brennan recently explained for the Court in *Kimmelman v. Morrison* (1986), 477 U.S. 365, 379-80, 91 L. Ed. 2d 305, 322, 106 S. Ct. 2574, 2585-86:

"While we have recognized that the ' "premise of our adversary system of criminal justice *** that partisan advocacy *** will best promote the ultimate objective that the guilty be convicted and the innocent go free" ' [citations] underlies and gives meaning to the right to effective assistance [citation], we have never intimated that the right to counsel is conditioned upon actual innocence. The constitutional rights of criminal defendants are granted to the innocent and the guilty

alike. Consequently, we decline to hold either that the guarantee of effective assistance of counsel belongs solely to the innocent or that it attaches only to matters affecting the determination of actual guilt.''

*At a minimum*, in the case at bar, this court should appoint new appellate counsel for the defendant and order that he or she furnish to this court a complete, sequential, and accurate record on appeal and the new counsel should be further directed to file new briefs. The Supreme Court has just this term in *Penson v. Ohio* (1988), 488 U.S. ___, ___, 102 L. Ed. 2d 300, 311-12, 109 S. Ct. 346, 352, cautioned, in words directly applicable to this cause:

"The need for forceful advocacy' does not come to an abrupt halt as the legal proceeding moves from the trial to appellate stage. Both stages of the prosecution, although perhaps involving unique legal skills, require careful advocacy to ensure that rights are not foregone and that substantial legal and factual arguments are not inadvertently passed over. ***

By proceeding to decide the merits of petitioner's appeal without appointing new counsel to represent him, the Ohio Court of Appeals deprived both the petitioner and itself of the benefit of an adversary examination and presentation of the issues."

However, because the majority in the case at bar has ostensibly elected to proceed to the merits despite the incompleteness of the record on appeal and an inadequate defendant's brief, I, too, by that compulsion, reach the merits, but dissent; and in doing so, I touch upon some issues inadequately addressed by defendant's own counsel.

## II

The events which unfolded in the court below present a highly unusual set of circumstances. Though I will review the testimony at the motion to quash and suppress in detail, a brief introductory overview of that testimony will be helpful in understanding the issues. The *undisputed* testimony below reveals that on January 12, 1985, the bodies of three deceased persons, Raynard Rule, Lauren Rule, and Yvonne Brooks, were found in a smoldering apartment at 458 North Hamlin, Chicago. The victims had been gagged and their hands were tied behind their backs. Raynard Rule had been stabbed and the two women had been shot. A fourth victim, Kim Brooks, subsequently died of burns from the fire connected with the same incident. Three weeks later, on February 5, 1985, during the day-

light hours at least two Chicago police detectives, John Sommerville and James Clemmons, entered the defendant's home located at 846 North Hamlin, Chicago. The detectives had no warrant to enter the home or to arrest anyone. Present in the defendant's home were the defendant's sister, Gloria Thompson, Gloria's baby, and three teenage boys, Willie Thomas, Terry Green, and the defendant, Charles Green, age 16. There may have been one or two additional family members present, but no adult and neither parent of the defendant was present. The detectives took the defendant from his home to the police station, where he was repeatedly questioned by different officers and an assistant State's Attorney. Sometime during the evening of February 5, 1985, the defendant's mother, Viola Green, went to the station and asked to see her son but her request was denied. Her minor son was kept in the police station all night and most of the next day, February 6, 1985. On the afternoon of February 6, 1985, the defendant was driven by police officers to the Cook County criminal court building at 26th and California, in Chicago, and at about 4 p.m. he was taken before the Cook County grand jury, where he was questioned by Assistant State's Attorney John O'Donnell. Assistant State's Attorney O'Donnell advised the defendant of his *Miranda* rights before the grand jury; the defendant acknowledged them and subsequently gave self-incriminating answers to questions put to him by Assistant State's Attorney O'Donnell. The same grand jury subsequently indicted the defendant for the murders.

Prior to trial, the defendant moved to quash his arrest and to suppress his grand jury testimony, and the trial court took extensive testimony on those motions. Thereafter, the assistant State's Attorney argued to the trial court that the defendant's grand jury testimony was admissible at trial because the defendant had *not* been placed under arrest or in custody until *after* he had given his grand jury self-incriminating testimony. That is to say, the State argued that the defendant had *voluntarily* left his home on February 5, 1985, with Detectives Sommerville and Clemmons, that he had *voluntarily* stayed in the police station the remainder of that day, and all the night of February 5, 1985, that the defendant also *voluntarily* stayed all the next day, February 6, 1985, in the police station, and that the defendant had *voluntarily* testified before the grand jury. Conversely, the defense argued that the defendant's arrest occurred in his home on February 5, 1985, and was constitutionally invalid on two grounds: (1) because it was without probable cause; and (2) because of the officer's warrantless entry into the defendant's

home. Thus, in the trial court, the State and the defendant both AGREED THAT THERE WAS NO PROBABLE CAUSE TO ARREST THE DEFENDANT ON FEBRUARY 5, 1985. Despite the vociferous urgings of *both sides* that at the time the detectives went to the defendant's home and took the defendant from his home to the police station, whether under arrest or by consent, there was no probable cause to arrest him, the trial judge nevertheless found that the detectives had probable cause to arrest the defendant and denied the motion to quash the defendant's arrest and to suppress evidence on that ground.

The defendant waived his right to trial by jury and the cause proceeded to a bench trial, during which the defendant's grand jury testimony was admitted as evidence against him. The trial court convicted the defendant of the murders and sentenced him to an imprisonment term of natural life. On defendant's appeal to this court, the State has dramatically reversed its original trial court position and now conversely argues, *for the first time*, that (1) the defendant was arrested in his home and (2) that there was probable cause for the defendant's arrest.

I am mindful that the defendant has been convicted of extremely brutal and hideous crimes. On the other hand, the defendant is a 16-year-old boy sentenced to life imprisonment on evidence clearly insufficient to convict him for for his own uncounseled testimony, before the same grand jury which indicted him, elicited from him after he had been in continuous police custody over 27 hours. Because I firmly believe that the applicable relevant and binding constitutional and statutory provisions, and the case law interpreting them, demand the legal determinations that (1) the defendant's arrest was not supported by probable cause and (2) the defendant's uncounseled statements before the grand jury which indicted him were the product of the defendant's illegal arrest and were in derogation of his guarantees under the fourth, fifth, sixth, and fourteenth amendments to the Constitution of the United States, as well as various statutory provisions, I dissent.

The underlying facts of this case are not complicated and should have been utilized by this court as a basis for the application of legal principles to those facts, as in the ordinary *modus operandi* for courts of review. Instead, the majority has rendered a decision which is disparate from the trial testimony, at variance with some of the trial court's specific findings and rulings, and even inconsistent within itself. For instance, the majority says (179 Ill. App. 3d at 10) that the defendant was legally arrested in his home and taken to

the police station, but later (179 Ill. App. 3d at 13), the majority conversely states: "[W]e cannot say that defendant should have reasonably believed he was under arrest and not free to leave the station." Query: If it wasn't reasonable for the defendant to believe he was under arrest, why then was it reasonable for the trial court to find that he was?

The internal inconsistencies in the majority opinion have resulted, in part, from at least the following reasons: (1) the trial court's confusion as to what the testimony had shown; (2) the refusal of the trial court, when requested, to make clear and concise findings of fact; (3) the diametrically contrary positions of the State in the trial court vis-a-vis its position in this court on the issue of probable cause; (4) the misrepresentations in Detective Summerville's testimony in the State's brief; (5) the failure of defendant's appointed appellate counsel, who was also the defendant's appointed trial counsel, to provide this court with a full and complete record on appeal; (6) the failure of defendant's appellate counsel to thoroughly and clearly advocate the defendant's cause in the defendant's brief in this court; (7) the failure of the trial court to determine all the issues apparently presented to it in the defendant's motion to quash and suppress; and (8) a determination by the majority to affirm this defendant's conviction no matter how inconsistent the reasoning employed to reach that result. For all of these reasons, it is necessary to an accurate appraisal of the facts and a correct application of the law that a thorough rendition of the testimony on the motion to quash the defendant's arrest and suppress evidence be set forth.

In reviewing this evidence it should be noted that the prosecuting attorneys were uniquely contending before the trial court that there was no probable cause for the defendant's arrest, that the officers did not arrest the defendant in his home on February 5, 1985, that the defendant was not under arrest but voluntarily accompanied the officers to the police station, where he voluntarily remained for 27 hours, to enable the prosecutors to urge that the defendant's subsequent uncounseled incriminating grand jury statement was unconstitutionally admissible as trial evidence against the defendant. It should also be noted in reviewing the motion to quash and suppress testimony and evidence that the defendant also contended that there was no probable cause for his arrest, but, the defendant conversely contended that the officers arrested him in his home for the quadruple murders, transported him to the police station where he was held in custody incommunicado for 27 hours, after which, without counsel

he was taken and gave an incriminating statement before the grand jury, in violation of his constitutional rights to be secure in his person and home against unreasonable search and seizure, against self-incrimination and the compulsion of being a witness against himself, to counsel and to due process of law.

### THE TESTIMONY ON THE MOTIONS TO QUASH AND SUPPRESS

#### CHARLES GREEN—Direct Examination

He is the Defendant. On February 5, 1985, in the morning hours he was at his home at 846 North Hamlin babysitting his niece LaToya Miller. Present was his brother, Terry Green, his cousin, Willie Thomas, and his sister, Gloria Thompson. At about 11:30 a.m. Gloria was about to take the baby to the doctor, and when she walked to the door and opened it, the police rushed in.

He was standing beside his sister when three policemen came in with their guns drawn. The police started walking around and searching the apartment and they had no warrant. The police remained in the apartment for about a half an hour, and when he asked the police if they had a warrant they told him to "shut up."

The police told him that "they had to take me in" and he left the apartment with the police. He did not leave voluntarily. Prior to leaving the apartment the police handcuffed him, took him outside to the police car, placed him in the police car, and took him to the station.

At the station they took him into a room but did not take the handcuffs off; he remained in the room for four or five hours. No policeman ever told him he could go home.

#### Cross-Examination

Terry Green is 19, Willie Thomas is 18. Gloria was 20, and her baby was 1. No other relative was in the apartment. When the police came in he was in the front room. When the police came in they did not identify themselves as policemen. The front door to the apartment was not damaged by the police. He did not know the names of the three policemen who came into the apartment. The first one that walked through the door pointed his weapon at his face.

He did not tell the police his name was Charles Green or that he went by the nickname of Little Charles. He did not

show any identification to the police in the apartment.

In addition to handcuffing him, they also handcuffed his brother and his cousin, and the police took Terry Green and Willie Thomas to the police station too. They did not take Gloria. His hands were handcuffed behind him and all three were taken in the same police car. The police told him he was under arrest but did not tell him what he was under arrest for.

He was not allowed to make a telephone call before he left the apartment and he did not call his mother before he left the apartment. He asked the police if they had a warrant.

After he was taken to the police station he was handcuffed to the wall for the entire time he was in the police station. He did not see his brother Terry Green or his cousin Willie Thomas while he was at the police station.

GLORIA ANNE THOMPSON—Direct Examination

On February 5, 1985, she lived at 846 North Hamlin and she is the sister of the defendant Charles Green. On February 5, 1985, at about 11 a.m. she was going to take her baby to the doctor. Present in the home were Charles, Terry, Willie Thomas, and her small sister Glendora.

As she got the baby dressed to go to the doctor and went to the door to open it "some police officers was [sic] at the door." She did not hear the officers knock and when she opened the door the officers came in without her telling them they could come in. There were three of them and one had his gun out. She asked the officers if they had a search warrant and they "told me to shut up whenever I asked them something."

Two officers were "just looking around" and the one with the blond hair went into the back room and was "in the drawers, just throwing clothes all over the place, and I asked him did he have a search warrant, and he said he didn't need no search warrant."

She told the officer that she was going upstairs to get her uncle so they could talk to her uncle and tell him what they wanted, and as she was leaving the doorway the officer "came behind me, and he stopped me at the front door and searched me (by) put[ing] his hands on me, around my waist, and down my legs and searched me." She then went upstairs and knocked on her uncle's door but he wasn't there, and

then she went downstairs to her aunt's house and brought her upstairs.

When Gloria came back upstairs all three police officers were still in the apartment, and two of them were talking to her brother and her cousin. They stayed in the apartment about 20 to 30 minutes.

During the time the police were in the apartment she called her mother's job and spoke to her mother. No one else spoke to her mother. When she was talking to her mother, the police officer kept saying "you are lying, you are lying," and she tried to give the officer the phone but he never accepted the phone to talk to her mother.

The police officers then left the apartment with Charles, Terry, and Willie, and prior to leaving they handcuffed them. The police officers said they were taking them to the station. They showed her no search warrant or arrest warrant.

Cross-Examination

She heard no knock at the door before she opened it. All three police officers came in at one time. She saw additional police officers outside the apartment. One officer had his gun out and it was pointed in front of him; the officers did not identify themselves as police officers or show any identification.

The police were in the apartment for 20 to 30 minutes. Charles Green did not speak to his mother on the phone when she called their mother and she spoke to her mother for about two or three minutes.

Charles Green, Terry Green and Willie Thomas were handcuffed together not separately. Her brother the defendant is not known as Little Charles, and he has never been known by that name.

It was then stipulated between the parties that the defendant made certain statements after he was taken to the police station which the Police intended to introduce as evidence against the defendant on his trial. The defendant then rested on the motion to quash the defendant's arrest and suppress evidence, and the People called the following witnesses.

JOHN SUMMERVILLE—Direct Examination

He is a detective assigned to Area 4, Violent Crimes. On January 12, 1985, he became involved in the investigation of a

quadruple homicide which occurred at 458 North Hamlin Avenue. Pursuant to that investigation, on February 3, 1985, he spoke to James Davis first at his home and later at Area 4. Present was Detective Capesius.

James Davis told him that on January 11 he was at a gameroom at 750 North Lawndale. While at the gameroom he saw Raynard Rule and Derrick House engage in a verbal argument outside the gameroom about money. The argument "escalated" into a fistfight with Raynard Rule getting the better of Derrick House. The fight took place in front of several people, including Derrick House's girl friend.

The following day, January 12, at 11 a.m. James Davis said that he was in the same gameroom with a man named Ghost. While at the gameroom, Derrick House and Charles Green came in and told Ghost they were going to "peep" Raynard, which Davis explained meant that they were going to look for him.

Davis then left the gameroom, returning about 12:30 where he remained until Derrick House returned with Charles Green about 6 p.m. At that time Ghost was present, a boy named Virgil was also present, and Derrick made the remark, "We got them, we got them, we just burnt, we got them, we just burnt Raynard."

Davis also said that they went into the back room of the same gameroom, where Derrick House removed a .45 silver-colored handgun from his waist. Charles Green had a blue-steel handgun but Davis did not know what caliber. Davis also stated that Virgil had a .38 caliber handgun. Davis said that they began to make small talk and then began smoking "happy sticks," which are marijuana dipped in PCP. Davis said he believed that Little Charles and Virgil were related, that they were cousins.

After his conversation with James Davis, Detective Summerville went to Orr High School, where "we identified Virgil as Virgil Bridges." Summerville then spoke to Virgil Bridges on February 5, first at his home and then later at Area 4 at about 10:30 to 11 in the morning. Present was Detective Capesius.

Bridges told them that Little Charles was his cousin, that his name was Charles Green, and he gave them Charles Green's address.

Virgil Bridges told them that on January 12 at 7:30 p.m. he

took a bus to the neighborhood of Chicago and Hamlin where he met Charles Green on the sidewalk and Charles told him that he had done something wrong. Virgil said that he asked Charles what he "did wrong" and Charles stated that he had gone up to Raynard's dope house with someone else and got Raynard to open the burglar gates. After the gates were open, things happened that were not supposed to happen.

After this conversation, Virgil went to the gameroom and overheard a conversation between Charles and Derrick House about opening the burglar gates. Virgil Bridges gave the address of Charles Green as 846 North Hamlin.

Detective Summerville went there on February 5, 1985, at 1 p.m. At that time he did not know what Charles Green looked like. He was accompanied by Detective James Clemmons, and no other policemen were at the address.

When he got to the second floor of the building he knocked and a woman answered. He and Clemmons identified themselves as Chicago police officers and asked if Charles Green lived at the apartment, and she said yes. Then, "we asked if we could speak with him, and we were allowed into the apartment." No force was used to gain entrance. Neither detective displayed his handgun.

He saw Charles Green in the apartment and asked who he was and Charles Green identified himself. Charles Green then got some school identification with his picture on it and showed it to him. He told Charles Green that the police wanted to ask him some questions, and asked him "if he would come with us." Charles Green said that he wanted to call his mother first, and that he would have to get dressed, and he was allowed to get dressed and speak to his mother over the telephone for a couple of minutes. He was not handcuffed at that time.

Summerville gave Charles Green "a ride to the police station." Charles Green was not handcuffed in the police car and the other occupants of the apartment were not taken to the police station. No handcuffs were placed on any other occupant of the apartment. The rooms of the apartment were not searched by either detective, nor was Charles Green searched while in the apartment. Summerville was in the apartment "maybe 15 minutes."

Charles Green was taken to Area 4, 3151 W. Harrison, to the second floor to an interview room. He was not handcuffed

nor was he fingerprinted, nor was he "booked," nor was he searched.

The conversation with James Davis had occurred on Sunday, February 3, 1985, and present was Detective Capesius. At that time James Davis told them that he would rather not talk in front of his mother, but that he had information regarding the multiple homicides which were then being investigated.

Cross-Examination

When he had the conversation with James Davis, James Davis had an injury to his leg from a gunshot wound. James Davis referred to Charles Green as Little Charles but he didn't know Charles' last name. He gave a description but he did not remember it. The description was important at the time but "I don't remember (it) at this moment."

James Davis' statement was not reduced to writing nor was Davis asked to "attest to, sign, affirm, or otherwise affix his signature to the statement as to (my) version of what it was." He did not make any notes of his conversation with Davis. He did not remember if Detective Capesius made any notes of their conversation with Davis. The reason why Davis' statement was not reduced to writing and given to Davis to review and sign was because "it is not necessary. We don't—it is something you don't have to do."

He did not tell Davis that if he cooperated with his investigation that he could possibly help Davis with regard to any criminal matters that Davis had at that time; nor did he have any knowledge that Davis had any pending criminal matters at that time.

Davis gave his statement at approximately 12 p.m. on February 3, 1985, and it took about a half an hour. Then he drove Davis back home. He did not prepare any reports regarding the interview of James Davis, but he did review a report of the interview of James Davis after it was typed by Detective Capesius.

He went to Orr High School on Monday February 4 "probably in the morning." He did not recall the name of the person he spoke to at Orr High School, but that person was an assistant principal. It was a male person, and he told them that "Virgil is probably Virgil Bridges."

He first met Virgil Bridges on the morning of February 5,

at 10 or 11 a.m. He met him at his home but he did not remember his address. He went there with Detective Capesius, and "he asked him if he would come with us to Area 4," and Bridges responded "sure." At Area 4 he interviewed Bridges in the presence of Detective Capesius. The interview took about a half an hour, and "several hours after that we went to Charles Green's house." Virgil Bridges was free to go home at that time. However, Bridges remained at Area 4 "probably a couple of hours."

He was not present on February 5, 1985, at 7:10 p.m. when Bridges gave a statement. Bridges did give a statement prior to 7:10 p.m. February 5, 1985, about 10 a.m. He did not see Bridges sign any statement but after he left Bridges at 11 a.m. he next saw him when he brought him into the room with Charles Green between 1:30 and 2 p.m., when Bridges was in the interview room he was not handcuffed, and neither he nor Detective Capesius struck him.

It was after he took the statement from Virgil Bridges that he went to 846 North Hamlin on February 5, 1985. James Davis did not know Charles' last name at the time he went to the home of Charles Green. Davis never identified any photographs of Charles Green as being "Little Charles." He asked Virgil Bridges for a description of Charles Green, but he did not write that description down.

He had seen an arrest report of Charles Green, and recognized Defendant Green's Exhibit No. 2 for identification as that arrest report. The arrest report contains the date of arrest in box 32 as February 5, 1985, and it contains the time as 1300 hours, which is 1 p.m. He did not know who prepared the arrest report. Detective Miller did not go to 846 North Hamlin on February 5, 1985, but his name was listed on the arrest report because "he would be the one who did arrest Charles Green."

When he arrived at the building he and Officer Clemmons walked up to the second floor and knocked on the door. The door was opened by a female, and "they were all near the door *** everybody was sitting in the dining room." He and Clemmons identified themselves as being police officers and asked the female if Charles Green lived at the apartment.

In the apartment was Charles Green, two other males, two women, and some small children. He asked who was Charles Green and when someone responded he asked for identifica-

tion from all subjects "so we could know who was Charles Green."

All three persons produced identification and he identified Charles.

"Q. What did you say to him?

A. We asked him if he would come to Area 4.

Q. What did he respond?

A. Yes.

Q. Did you tell him why you wanted him to go to Area 4?

A. I believe we told him it was for an investigation.

Q. Did you tell him he didn't have to go to Area 4?

A. Yes, sir, he knew that.

Q. When did you tell Mr. Green that he didn't have to go with you to Area 4?

A. When I was talking on the telephone.

Q. Did you tell him or did you tell the person that you were talking to on the telephone?

A. I told them both. They were standing right next to me.

Q. Were you talking to both people at the same time?

A. At that point, yes, sir.

Q. Who did you speak with on the telephone?

A. His mother.

Q. How do you know it was his mother?

A. She told me she was his mother.

Q. Do you know her name?

A. No, sir.

Q. What did you tell her on the phone?

A. I told her we wanted to talk to Charles. We had some questions we wanted to ask him regarding an investigation, that he was not under arrest.

Q. Did you tell her anything else?

A. Where he would be, Area 4.

Q. Did you tell her anything else?

A. I don't think so."

He took Charles Green to the police station rather than interview him at home because it is hard to interview somebody about a quadruple murder in the presence of five or six friends. The two other male individuals in the apartment were not taken to Area 4 Violent Crimes. He did not know their names nor would he recognize them.

"Q. Now, when you went to Charles Green's flat, he was a suspect, was he not?

A. No, sir. He had only been told that Charles Green had 'knowledge' of the murders, and 'that he had did something wrong, that he had got Raynard to open the gates.' "

He did not have Charles Green's fingerprints and palm prints taken when he arrived at Area 4 to compare with those prints that were found on a gas can at 458 North Hamlin on January 12, 1985. He interviewed Charles Green within minutes of arriving at Area 4.

Examination by the court:

"THE COURT: Officer, when did you arrest Charles Green for these murders?

A. He was placed under arrest after he came back from the Grand Jury."

Redirect Examination

Detective Miller arrested Charles Green after he came back from the grand jury.

JAMES CLEMMONS—Direct Examination

He is a detective assigned to Area 4. On February 5, 1985, he accompanied Detective Summerville to 846 North Hamlin at 1 p.m. They went to the second floor, knocked on the door; the door was opened by a young adult. They identified themselves as Chicago police officers and requested to speak to Charles Green. They were admitted into the apartment. "There were a number of subjects sitting at the table." They asked the three male subjects if they would identify themselves and said they had come to speak with Charles Green. Charles Green identified himself, and they "asked him if he would come into Area 4 for an interview." They were in the apartment "no more than 15 minutes."

Charles Green was transported to the police station and he was the only person taken to the police station. When Charles Green was taken to the police station "he was not handcuffed or in any way restrained."

Charles Green had a conversation on the phone with his mother before they left the apartment. The person that opened the door to the detectives was a female.

Cross-Examination

Defendant's exhibit No. 2 "appears to be a copy of an ar-

rest report for Charles Green." He did not know who prepared it, but his name was one of the names in box 56 on the report. Box 32 of the arrest report states the arrest to have occurred on February 5, 1985, at 1 p.m. That was the time that he (and Summerville) first went to the apartment of Charles Green. Box 5 of the arrest report has the address of the defendant's arrest as being 846 North Hamlin, Apartment 2. The arrest report shows that the I.R. number for Mr. Green is contained in box 20 and is stated to be 731781. Detective Clemmons said "probably the booking officer placed it there."

Examination by the court:
"Q. Officer, did you advise this defendant at any time that he was under arrest?
A. No, sir I did not.
Q. Did anyone in your presence at anytime advise this defendant that he was under arrest?
A. No, sir."

MICHAEL MILLER—Direct Examination
He was assigned to Area 4, Violent Crimes. He was involved in an investigation of a multiple homicide which occurred on January 12, 1985, at 5:45 p.m. at 458 North Hamlin Avenue, Chicago. The victims were Raynard Rule, Lauren Rule, Yvonne Brooks, and Kim Brooks. The manner of death of Raynard Rule was stabbing, and the manner of death of Lauren Rule and Yvonne Brooks was gunshot wound. The condition of Kim Brooks on February 5, 1985, was that she was dying. He was aware that two .45 caliber spent shell casings had been recovered from 459 North Hamlin prior to February 5, 1985, and that there had been some burglary gates at that apartment on January 12, 1985.
On February 5, 1985, he spoke with Charles Green in an interview room at Area 4. He first saw him at 1:30 p.m. and spoke with him in the presence of Detective Summerville.
"Q. Now, at the time you spoke with Charles Green, was he under arrest for anything?
A. No, he was not.
Q. Was he or was he not handcuffed at that time?
A. He was not.
Q. Was his freedom of movement restricted at any manner

at that time?

A. No.

Q. Do you know whether or not any charges had been lodged against him at that time?

A. To my knowledge he was not charged with anything."

He spoke to Charles Green again at 2 p.m. the same day, and at that time no charges had been lodged against him. Neither he nor Detective Summerville informed the defendant that he was under arrest for anything at that time. At no time was defendant handcuffed on February 5, 1985, and at no time was the defendant's freedom of movement restricted in any manner on February 5, 1985.

"Q. If Charles Green wanted to go home on February 5, 1985, would you have let him go home?

A. Yes."

Assistant State's Attorney George Ellison came to the police station on February 5, 1985, and interviewed the defendant. After that interview no charges were filed. On February 6, 1985, he took Charles Green to the Cook County grand jury.

"Q. Was he under arrest at that time?

A. No, he was not.

Q. Was his freedom of movement restricted in any manner at that time?

A. No, it was not."

The defendant was not handcuffed when he was brought to 26th and California and testified before the grand jury. He arrested Charles Green on February 6, 1985, after he had testified before the grand jury "some time in the afternoon hours of the 6th of February."

Cross-Examination

Defendant's exhibit No. 3 is a copy of the arrest report for Charles Green. Box 22 states that the time of arrest occurred at 1 p.m., February 5, 1985. His name was contained in box 55 as an arresting officer. Box 41 has the person notified as Sergeant J. Regan, Area 4, Violent Crimes, 1315 hours. That would be 15 minutes after the time of arrest. Sergeant J. Regan was his supervisor on February 5, 1985. Defendant's exhibit No. 3 is a supplemental report bearing his signature which he signed some time in the evening hours of February 6, 1985, and it was approved on the morning of February 7,

1985. He assisted in the preparation of that report. Page 2 of that report states that "based on information received House and Green were taken into custody on 5—5—85 [*sic*]." He, Detective Michael Miller prepared the report.

"Q. Mr. Green was in custody on February 5, 1985; is that correct?

A. In a manner of speaking.

Q. Yes or no, was he in custody?

A. Yes, he was."

## Redirect Examination

"Q. Detective Miller what do you mean when you say in a manner of speaking he was in custody on February 5, 1985, referring to Charles Green?

A. He was in the police presence in a police facility.

Q. Was his freedom of movement restrained in any manner on February 5, 1985?

A. No. Charles Green was not handcuffed, nor arrested for anything nor were charges lodged against him, nor was he processed in any manner on February 5, 1985."

## Re–Cross-Examination

"Q. Does custody mean free to leave you.

A. Yes."

## Examination by the court:

"Q. How long were you in the defendant's presence [February 5, 1985]?

A. Three hours, more or less.

Q. Was this continuous presence of the defendant?

A. In and out of the room, yes, sir.

Q. What time of day was this?

A. Approximately 2:00 p.m., that afternoon until 5, 5:30.

Q. After you got through at 5:30 did the defendant go home?

A. No, sir.

Q. How old was the defendant on that date?

A. Sixteen.

Q. Was he told that he could go home?

A. Yes.

Q. After you had gotten through?

A. Yes, sir.

Q. What about in the beginning?
A. He was always told he had freedom to leave any time he wished.
Q. Did you tell him that?
A. Yes, sir.
Q. Who else told him that?
A. Detective Summerville.
Q. Did he finally leave the premises?
A. No, sir.
Q. When you got through what happened to him?
A. He stayed in the facilities over night.
Q. Whereabouts?
A. In the interview room in Area 4 Violent Crimes.
Q. Did he ever leave that interview room?
A. Yes, the washroom and to eat, to my knowledge.
Q. Did he ever leave the facility?
A. No, sir.
Q. Next day he was then taken to the Grand Jury?
A. He was."

JOHN O'DONNELL—Direct Examination

He was an assistant State's Attorney on February 6, 1985. On that day he was assigned to the felony preliminary hearing division, Branch 66 of the State's Attorney's office. The grand jury was a part of that unit. He saw Charles Green and he spoke to him on that date on the fourth floor at 26th and California (the criminal court building) at approximately 4 to 5 p.m. Members of the grand jury were present at that time. People's exhibit no. 1 is a 22-page transcript of the testimony given by Mr. Green before the Cook County grand jury on February 6, 1985. Before the testimony of Charles Green he made a statement to the members of the grand jury. People's exhibit No. 1 is a true and accurate transcript of the questions asked and the responses given by Charles Green. It also reflects the statement which he made to the grand jury.

Before Charles Green testified at the grand jury no charges had been placed against him. Criminal charges were placed against Charles Green after his (O'Donnell's) discussions with Quinn, Dernbach and Detective Miller, which was after Charles Green had testified before the grand jury. Prior to Charles Green testifying before the grand jury he was in the State's Attorney's office.

People's exhibit No. 1 states that prior to the questions and answers concerning the homicides given before the Cook County grand jury the following proceedings occurred at the grand jury:

"Charles Green having been first duly sworn was asked and testified as follows:

Examination By Mr. O'Donnell

Q. Charles, you have been previously sworn in?

A. Yes.

Q. Will you tell the ladies and gentlemen your name?

A. Charles Green.

Q. How old are you?

A. Sixteen.

Q. Charles, you gave a court reported statement last night to another State's Attorney, is that correct?

A. Yes.

Q. And at that time that State's Attorney read you your rights; is that correct?

A. Yes.

Q. And you told that State's Attorney that you understood your rights; is that correct?

A. Yes.

Q. Now I'm going to read your rights again to you. Do you understand you have a right to remain silent?

A. Yes.

Q. Do you understand anything you say can be used against you in a court of law?

A. Yes.

Q. Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned?

A. Yes.

Q. Do you understand that if you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you wish one?

A. Yes.

Q. Understanding these rights, do you wish to talk to me now?

A. Yes."

The witness then read on the suppression hearings the transcript of the proceedings before the grand jury.

Cross-Examination

Prior to Charles Green testifying before the grand jury, Assistant State's Attorney O'Donnell had spoken with the defendant, at which time the defendant told him everything which he later testified to before the grand jury. Charles Green did not tell him or state anything new before the grand jury.

O'Donnell had also been provided with a prior court-reported statement and some police reports prior to the defendant's appearance before the grand jury. Defendant Green's exhibit No. 6 is the court-reported statement which he reviewed prior to interviewing the defendant. Exhibit No. 6 contains the same matters that defendant testified to in front of the grand jury. Defendant's exhibit No. 6 was taken on February 5, 1985, at 11:10 p.m. by Assistant State's Attorney George Ellison. Prior to going before the grand jury with the defendant he prepared a "John Doe Form 101." This is a form that "we present to the Foreman of the Grand Jury anytime we present any witness or any witnesses to the Grand Jury." The purpose of a form 101 is to inform the foreman of the purpose of going before the grand jury, either seeking an indictment or providing a witness for information. Green's exhibit No. 4 appears to be a form 101. It is a form that is used by the State's Attorney's office, and Green's exhibit No. 4 contains the names of Assistant State's Attorneys Dernbach, Brennan and Quinn. Green's exhibit No. 4 has the name of the defendant, his age, and the date of his arrest to be February 5, 1985.

The State rested on the hearing of the defendant's motions to quash his arrest and suppress evidence.

On rebuttal, the defendant called as witnesses Terry Green, the defendant's brother; Tanya Green, the defendant's sister; and Willie Thomas, the defendant's cousin, whose testimony was substantially the same as the foregoing testimony in chief of the defendant's sister, Gloria Ann Thompson. The defendant then called Virgil Bridges as a rebuttal witness and he testified.

VIRGIL BRIDGES—Direct Examination

He lived at 620 S. Lawndale with his mother, sister and brother. On the morning of February 5, 1985, the police officers came to his house about 9 a.m., and "they told me they were going to take me up to Orr High School."

The officers took him to the police station at Kedzie and Harrison and not to Orr High School. At the station the officers held him in a room on the second floor and handcuffed him to a ring on the wall. He remained there from approximately 9 a.m. until 7 p.m.

About three hours after he had arrived at the police station, he had a conversation with Officer Miller. "He asked me did I know a Little Charles and I told him no, I didn't. Then he said that I was lying and then he slapped me and I said I wasn't lying. And they he hit me in my chest, and then he hit me in my ribs, and then he tried to kick me in my privates, but I moved. So then he said you are lying again, and then they left out."

At no time during the first interview did he tell the officer that he knew a Little Charles, that he had had a conversation with Charles Green or Little Charles on January 12, 1985. He did not tell the officers that Charles Green had told him that he (Green) had done something wrong. At no time during the first three hours of the interview did he tell the officers that Charles Green had told him that Green had gone to Raynard's house with someone else and had gotten Raynard to open the gates for him; nor that Charles Green had told him "what happened up there wasn't supposed to go that way." He did not tell the officers that he was at the gameroom and heard Charles Green and Derrick House talking about the burglary bars at Raynard's house.

During the time he was held, one of the officers slapped him, and Officer Miller came in and put a brown bag over his head, and then he made a statement at around 7:10 p.m. An assistant State's Attorney came in and he signed the statement and they told him he was free to go. Defendant's exhibit No. 1 contains his signature on page 1 and page 2, and it is the statement that he gave on February 5, 1985, at 7:10 p.m.

Cross-Examination

He is 17 years of age. He does not have a street name and neither does the defendant. He was not handcuffed in the car, or until he arrived at the police station at Harrison and Kedzie and put into the interview room. At that time, they handcuffed him to a ring in the room, and he stayed there from about 9:10 a.m. until 7:10 p.m., at which time he signed the

statement and they let him go. While he was in the room, Officer Miller and Officer Summerville came in and closed the door and talked to him for about three hours.

Officer Miller slapped him at least 50 times and hit him on both sides of the face. Detective Summerville also hit him in the stomach with his fist five or six times, and "he had a serious look on his face." Officer Miller put a Jewel's bag over his head and squeezed it so that he could not breathe. He screamed and he kicked but he couldn't see because of the bag on his head. Then Officer Miller took the bag off and said "better tell us what we want to know." Officer Miller said that he wanted to know whether he (Virgil Bridges) knew a Little Charles, but he told him he did not know a Little Charles. Charles Green is his cousin. They also tried to kick him "in my privacy." Officer Miller kicked him once in the groin and attempted to kick him again but he moved. He then made a false statement to the police about his cousin, Charles Green.

When the State's Attorney came and he asked him how he was, and "I told him I was doing alright." He told the State's Attorney that he had seen the defendant on Chicago Avenue, and at that time he didn't say what had happened, but he had gotten them to open the bars. He told the State's Attorney that he saw Charles Green on January 12, 1985, at 7 to 7:30 p.m. at Chicago and Hamlin, and that he had told him that he (the defendant) "did something wrong." He told the State's Attorney that Charles Green told him that he and someone else had gone to Raynard Rule's place and he had gotten Raynard to open the gates for them. This was what the police had told him to tell the State's Attorney. He also told the State's Attorney that Green had told him "that wasn't suppose to go that way." The police had told him to tell that to the State's Attorney. The police also told him to tell the State's Attorney that Green talked to Derrick House and that he said that Green had opened the bars.

The police did not tell him to tell the State's Attorney that Green had shot anyone, or stabbed anyone in the house, or that he had tied up any of the women or set any of the women on fire. He said what he told the State's Attorney was in the statement but "all of it is untrue. I hadn't even seen Green."

Redirect Examination

Nothing in the statement says that Little Charles was Charles Green, my cousin.

GEVENA DUNCAN BRIDGES, a defense rebuttal witness—Direct Examination

She lives at 620 South Lawndale. On February 5, 1985, the police came to her house at about 9 a.m. She asked one of the officers "what was wrong and he told me it was nothing to be concerned about; that an incident had happened at Orr High School, and that my son had been implicated in the incident and they wanted to take him over to clear his name. And he said it wouldn't take long; that it was nothing to worry about and they would bring him back."

Her son left with the officers and she next saw him about 8 or 9 p.m. that evening when he came home. At that time his face was slightly swollen, and he said, "Ma, I didn't go nowhere near Orr High School. They took me straight to Kedzie and Harrison police station." Her son further told her that he had been handcuffed and beaten and that a plastic bag had been placed over his head.

Cross-Examination

When her son came home his cheeks and his jaws were slightly swollen. "One side of his face was bigger than the other side." It was immediately noticeable. She did not see any blood, nor take her son to the hospital, nor seek medical treatment. "I asked him if he wanted to go to the doctor, he said no." Her son had told her that he had been kicked also. He told her that he had signed a statement at the police station. She made no complaint to the police department about how the police had treated her son. Neither did she contact the State's Attorney's office, or the United State's Attorney's office, or any law enforcement officer about how her son had been treated. Neither did she go to the police station that day.

Redirect Examination

She tried to get in touch with Russ Ewing (Chicago Channel 7 television news reporter) about her son, who had been slapped and kicked by the police officers.

VIOLA GREEN—Direct Examination

She is the mother of the defendant, Charles Green. On February 5, 1985, she received a telephone call from Gloria Thompson, her daughter. Gloria "told me that some policemen was at my house and they were getting my son, Charles Green and Terry Green and my nephew, Willie Thomas, and that they were searching the house." She never talked to a policeman when Gloria called her.

After she received the phone call she went back to her machine where she worked, got her purse, punched out, and left for the police station at Harrison and Kedzie. When she arrived there she spoke to Sergeant Regan.

"Q. Did Sergeant Regan ever tell you that your son was free to leave?

A. No.

Q. Did Sergeant Regan let you see your son at the police station?

A. No."

Cross-Examination

"Q. Did you ask to see your son?

A. Yes.

Q. Did you see him anywhere?

A. No."

She remained at the police station for about 45 minutes or an hour, and then she left the station and went home.

The trial court ordered that Sergeant Regan be called as a witness.

The defendant sought to introduce as defendant's exhibit No. 7 a transcript of the testimony of James Davis which was presented in another proceeding in behalf of one Derrick House, on the hearing of House's motion to suppress evidence. The State objected, contending that "only the relevant questions and answers be considered by the Court." The defendant agreed that "only those portions which the court already previously deemed appropriate and admissible into evidence" would be considered by the trial court. The trial court stated, "I have to read only the relevant portions of this transcript as it also applies to the facts produced in this case, and they are offered for the purpose of contradiction or rebuttal."

Transcript of James Davis' Testimony (testifying on behalf of Derrick House's motion to suppress evidence in another proceeding)

Direct Examination

He lives at 852 North Kolin. On February 3 or 4, 1985, he had been shot in the leg and was at his home recovering from the wound. He was arrested at his home by Detective Foley and taken to Area 4. While at Area 4 the officers took him to a little room where six or seven officers were present. At that time he thought he had cases pending against him. The officers kept him there about three hours.

The detectives gave information to him which concerned an incident that occurred on January 12, 1985, with respect to a fire at 458 North Hamlin.

He did not tell the police that the previous evening Derrick House and Raynard Rule had gotten into an argument in front of a gameroom at 750 North Lawndale. He said he did not "even know Raynard Rule." He denied telling the police that Little Charles displayed a revolver, or that Ghost produced a .41 Magnum bluesteel revolver, or that Virgil displayed a .38 bluesteel revolver, or that Derrick House displayed a silver-colored .45 automatic pistol that evening about 6 p.m. He also denied saying that the four individuals placed their guns on the couch and smoked "happy sticks."

Cross-Examination

He did not see Derrick House on January 12, 1985. He did not tell the police that Derrick House and Little Charles were involved in the murders, but the police told him that they were. He did not tell the police that on January 11, 1985, at 7 p.m., Derrick House approached Raynard Rule in front of the gameroom and that he had heard an argument between Derrick House and Raynard Rule. He denied telling the police that he had seen a fight between Rule and House with Raynard getting the best of House. He did not tell the police that on January 12, 1985, at 11 p.m. he was in the gameroom with Ghost when Derrick House and Little Charles came in and he overheard Derrick House say "we are going to peep Raynard." He did not tell the police that he saw Derrick House and Little Charles leave the gameroom together and return about 12:30 p.m. He did not tell the police that Der-

rick House and Little Charles returned to the gameroom about 6 p.m. and that he overheard Derrick House say "[W]e got them, we burned them." He did not see Derrick House with any guns that day. He was presently in the penitentiary for an armed robbery, residential burglary, attempted burglary, and UUW (unlawful use of weapons). Before that time he was in the House of Corrections convicted of burglary, which conviction occurred on April 9, 1985.

The following witnesses were called in surrebuttal by the People.

## JOHN REGAN—Direct Examination

He was the second watch commander in Area 4, Violent Crimes. On February 5, 1985, he was involved in the investigation of the homicides which occurred on January 12, 1985, at 458 North Hamlin. He did not recognize the arrest slip for Charles Green, defendant's exhibit No. 2. He knew that on February 5, 1985, Charles Green had been brought into the Area.

"Q. My question to you, Sergeant Regan, is were you ever informed on February 5, 1985 that Charles Green was in custody?

A. I knew that he was in the Area.

Q. Was he in custody when he was in the Area?

A. No, sir, he was not."

Defendant Green's exhibit No. 3, consisting of four pages, contained his signature. He reviewed it, he then testified:

"Q. Were you informed via those documents that on February 5, 1985, that Charles Green was in custody?

A. Yes, sir. I have to correct myself."

## GEORGE ELLISON—Direct Examination

He was a State's Attorney assigned as a felony trial assistant. On February 5, 1985, about 7:10 that evening, he spoke to Virgil Bridges. He did not observe any bruises on Virgil Bridges' face. He spoke to him alone and he asked him if he had been treated well by the police and Bridges replied that he had.

## MICHAEL MILLER—Direct Examination

On February 5, 1985, he spoke to Virgil Bridges at Area 4 in the interview room. Neither he nor Detective Summerville

slapped, hit, kicked or placed a plastic bag over Virgil Bridges' head or squeezed the throat of Virgil Bridges or tried to suffocate him.

## III

The State's assertion in the trial court, unlike in this court, that there was no probable cause for the defendant's arrest was absolutely correct.

Detectives John Summerville and James Clemmons were shown to have taken the defendant from his home at 1 p.m. on February 5, 1985. Of these two, only Detective Summerville testified to the alleged reasons the detectives went to the defendant's home. Because Summerville's rendition of the alleged information he received from James Davis is essential to a finding of probable cause, it is necessary to examine Detective Summerville's testimony in some detail in order to determine exactly what information Detective Summerville had allegedly received from James Davis when he and Detective Clemmons went to the defendant's home. On direct examination, Detective Summerville testified as follows with regard to his conversation with James Davis.

"Q. Detective Summerville, just relate what the content of the conversation was that you had with James Davis at the police station?

A. James Davis told me that on the 11th of January he had occasion to be at the gameroom at 750 North Lawndale. While at that gameroom he saw Raynard Rule and Derrick House in a verbal argument outside the gameroom.

Q. What was that argument about; did James Davis tell you?

A. Yes, he said it was about money.

Q. What else did he tell you?

A. The argument soon escalated into a fist fight wherein Raynard Rule got the better of Derrick House in that fight. The fight took place in front of several people, including Derrick House's girlfriend. The following day, the 12th of January, at approximately 11:00 in the morning, James Davis was at the same gameroom with a man he identified as Ghost. While at the gameroom Derrick House and [defendant] Charles Green came in and told Ghost that they were going to peep Raynard. Davis explained that meant they were going to look for Raynard. Davis then left the gameroom, returned

about 12:30 where he remained until Derrick House returned along with [defendant] Charles Green at about 6:00 p.m. At that time, Ghost was present, a boy named Virgil was also present, and Derrick House made the remark, 'we got them, we got them, we just burnt, we got them, we just burnt Raynard.'

Q. What else did James Davis tell you?

A. Davis went on to say they went into the back room of the gameroom where Derrick House removed a .45 silver colored handgun from his waist. [Defendant] Charles Green had a blue steel handgun. He didn't know what caliber. He also stated that Virgil had a .38 caliber handgun. They began to make small talk, and then began smoking happy sticks, which is marijuana dipped in PCP.

The State's brief in this court virtually tracks Detective Summerville's aforesaid direct examination testimony from the report of proceedings as the statement of facts of the case. The State's brief states:

"Pursuant to his investigation, Detective Summerville interviewed James Davis on February 3, 1985. James Davis told Detective Summerville that on January 11, 1985, he saw Raynard Rule and Derrick House get in an argument outside of a gameroom located at 750 North Lawndale. This argument over money escalated into a fist fight wherein Raynard Rule 'got the better of' Derrick House in front of several people including House's girlfriend. James Davis also told Detective Summerville that on January 12, 1985 at 11:00 a.m. he saw defendant and Derrick House come into the gameroom and tell a friend they were going to 'peep' or look for Raynard Rule. At 6:00 p.m. on January 12, Derrick House and defendant returned to the gameroom and saw a boy named Virgil; and Derrick House remarked, 'we got them, we got them, we just burnt Raynard.' Detective Summerville also testified that James Davis saw House, defendant and Virgil with handguns at the gameroom and they began smoking 'happy sticks' which is marijuana dipped in PCP."

And, in a final and conclusive transposition, Detective Summerville's aforesaid controverted motion to suppress direct examination (and the above-quoted portion of the State's brief) has been copied virtually verbatim into the majority opinion as fact (179 Ill. App. 3d at 8) as follows:

"At the hearing on defendant's motion to quash his arrest,

Detective John Summerville testified that pursuant to his investigation of the deaths of Raynard and Lauren Rule and Yvonne and Kim Brooks, he spoke to James Davis on February 3. Davis told Summerville that on January 11 he saw Rule and House get into an argument and fistfight over money; Rule 'got the better of House' in front of a crowd which included House's girlfriend. On January 12 at 11 a.m., he saw defendant and House at the Lawndale game room at which time they said they were going to 'peep' or look for Rule, and later that evening he saw defendant, House and a boy named Virgil, who all had handguns and were smoking 'happy sticks' (marijuana laced with PCP), and heard House say, 'We got them, we got them, we just burnt Raynard.' "

Now, in my judgment, Detective Summerville's rendition of what James Davis (not shown to have been previously reliable) allegedly told him would certainly constitute a reason for further investigation, but it would not constitute probable cause to arrest the defendant for murder. But an extended discussion on this point, however, is unnecessary because Detective Summerville's above-quoted testimony was shown to be a lie, or at least a deliberate misrepresentation (if there is a difference between the two). On cross-examination, Detective Summerville testified:

"Q. Now, did James Davis ever give you the name Charles Green?

A. James Davis referred to Charles Green as Little Charles.

Q. He did?

A. Little Charles.

Q. He gave you the name of Little Charles, did he not?

A. Yes, sir.

Q. Did he tell you that he knew that Little Charles was Charles Green?

A. He didn't know Charles' last name.

Q. Did he give you a description of Little Charles?

A. Yes, sir.

Q. And what was that description?

A. I don't remember now.

Q. Was the description of Little Charles important to your investigation, Detective Summerville?

A. At that time, yes, sir.

Q. *But you did not take it down or write it down or include it in any report* or remember it, is that correct?

A. I did remember it, yes, sir.

Q. What did you remember about the description?

A. I don't remember at this moment.

Q. You took a statement from James Davis, is that correct?

A. Yes, sir.

Q. You interviewed James Davis, is that correct?

A. Yes, sir.

Q. *Did you ever ask that the statement, the interview, be reduced to writing?*

A. *No, sir.*

Q. Did you ever ask that Mr. Davis attest to, sign, affirm, or otherwise affix his signature to the statement as your version of what it was?

A. No, sir.

Q. Did you ever show him what you had written down or any notes or memorandum or the like that you took with regards to that statement?

A. Any notes that were taken were taken in his presence.

Q. *Did you take any notes with regard to his statement?*

A. *I didn't, no sir.*

Q. Was anyone else present when you took the statement from Mr. Davis?

A. Detective Capesius.

Q. Did you observe Detective Capesius make any notes while he was interviewing or while you were interviewing Mr. Davis?

A. I don't remember, sir.

Q. Is there any reason why you didn't reduce the statement to writing and give it to Mr. Davis to review and sign?

A. It is not necessary.

Q. Why is it not necessary?

A. It is not necessary. We don't—it is something you don't have to do." (Emphasis added.)

Thus, on cross-examination—and in direct contradiction to his misrepresentations on direct examination—Detective Summerville admitted that the person to whom James Davis allegedly referred as being with Derrick House, possessing the handguns, having the conversations, smoking "happy sticks," etc. was not Charles Green, as he had stated on his direct examination, but one Little Charles, and that he hadn't bothered to write down Davis' description of Little Charles. Nor could he remember it. If Davis' alleged description fit

Charles Green as he appeared seated in the courtroom, or as he appeared when Detective Summerville went to the defendant's home on February 5, 1985, certainly Detective Summerville would have said so. Moreover, no testimony was offered that Davis ever identified the defendant, or a picture of the defendant, as being the Little Charles about whom Davis allegedly spoke. In fact, not one witness in court identified the defendant as ever having used the sobriquet "Little Charles." Over and above Detective Summerville's attempt to mislead the court by falsely testifying that Davis had said "Charles Green" was with Derrick House in the gameroom after the killings, had a handgun etc., there is simply no nexus between the Little Charles allegedly referred to by Davis and the defendant in court.[1]

Assuming that the Summerville-Davis conversation did take place, the cross-examination of Detective Summerville demonstrated that Davis did not know Little Charles' last name and did not identify the defendant, or the defendant's picture, as the "Little Charles" to whom he referred. Since Detective Summerville did not himself testify that the defendant's physique was similar or identical to the description of Little Charles provided to him by James Davis, it is not even debatable that probable cause to arrest the defendant was nonexistent.

The State and the majority's reliance upon James Davis' communication to Detective Summerville for probable cause is ill founded simply because, as it was established, James Davis did not know the defendant, James Davis did not know Little Charles' last name, and James Davis did not in any manner *identify the defendant as Little Charles.* Undoubtedly the trial assistant State's Attorneys recognized this immutable conclusion because they conceded on the motion to suppress hearing that the detectives did *not* have probable cause to arrest the defendant when they went to his home

---

[1]As noted above, James Davis, testifying on Derrick House's motion to suppress, denied telling Detective Summerville the matters attributed to him by Summerville. But neither the defendant nor his attorney was present for Davis' testimony, and the defendant did not call Davis as a witness on his motion to suppress in order to contradict Summerville. The defendant's attorney did, however, proffer a transcript of Davis' testimony to the court, the "pertinent" parts of which the court said he considered, a questionable practice to say the least, given that Davis' live testimony was available to the defendant with the defendant's own attorney being able to guide the examination of Davis into appropriate and germane areas. In addition, a court of review has no way to determining which portion(s) of the transcript the trial court considered "pertinent", the relative weight he gave to the "pertinent" portion(s), etc.

on February 5, 1985.

A mere cursory reading of the record on appeal clearly reveals that on February 5, 1985, the police "picked up" the defendant at his home on the speculation and hope that he might give them some information which would further their investigation into the brutal January 12, 1985, homicides. The police held the defendant at the police station incommunicado from his family, all night and all the next day—over 27 hours. Late on the afternoon of February 6, 1985, an assistant State's Attorney took the 16-year-old defendant before the grand jury (the propriety of which I discuss in part V, *infra*), obtained from him an incriminating statement under oath and then formally charged the defendant with murder. Indeed, on the hearing of the defendant's motion to quash his arrest and suppress, this is precisely what the State argued to the trial court had occurred, except the State there fallaciously contended that the defendant went *voluntarily* to the police station. The trial court, however, found differently, that the defendant was under arrest when he was taken by the police to the police station at 1 p.m. on February 5, 1985.

Furthermore, the trial court made findings of fact in which he demonstrated his obfuscation as to what the testimony had been on the motion to suppress evidence, and upon which he relied, mistakenly, in finding probable cause to arrest the defendant, contrary to the State's urging that the defendant was arrested without probable cause. A few examples will suffice to demonstrate the trial court's confusion.

In mistakenly recounting the facts on the motion to suppress, the trial court incorrectly stated that Detective Summerville testified that Virgil Bridges told him:

> "On January 12th, he took a bus with defendant Charles Green and that Charles Green had told him that he had done wrong. He said that he had—that is Charles Green—had gone to Raynard Rule's dope house and that things had happened that were not suppose to have happened, and Charles had told him about Charles opening the burglar gates of Raynard Rule's apartment. A written statement to the above effect was made by the defendant preceded by an oral statement prior to the time of its being reduced to writing."

The record does not contain any such testimony of any written statement by the defendant "preceded by an oral statement prior to the time of its being reduced to writing." Even if such statement had existed it could not have been relied on by the trial court to establish probable cause for the defendant's arrest for the simple rea-

son that the "fruits" of an arrest cannot be used to justify the arrest.

The trial court further mistakenly stated:

> "Charles Green told this court that he (Detective Miller) struck him 50 times in the face, both sides took in the stomach, 5 or 6 times in the stomach. He was kicked in his privates and they put a Jewel's bag over his head in such a manner that he could hardly breathe. In this manner the statement was forced from him and the detectives told him what to say. This statement was made, that it, the statement later made to an Assistant State's Attorney, but that the testimony here was that the defendant made no complaint about any mistreatment at that time."

There simply was no testimony from the defendant which is remotely similar to the aforesaid quoted portion of the trial court's "finding." It is quite apparent that the trial court derived this confusion from the identical testimony of the witness, Virgil Bridges.

The trial court likewise incorrectly recapitulated the motion to quash and suppress evidence:

> "Summerville also related that the, that he told the defendant that he had opened the gates and knew something about the crime, and subsequently that night there were statements made, one at or about 11:10 p.m., which was proceeded by, to 11:20 to an assistant State's Attorney. That statement by Charles Green was of an inculpatory nature insofar as his presence on the scene, that is the time that was involved. In that statement he indicated that he, once he heard the shot, he ran down the stairs and then back to the gameroom. There were other statements made. The character of those statements, I assume that previous statements, oral statements, were parallel to the statements made, at least there was one made parallel to that statement made at that point."

Detective Summerville gave no such testimony. There was no testimony or other evidence of what the defendant said in any oral or written statements. The only testimony or evidence of anything the defendant stated while he was at the police station or at the criminal courts building is the defendant's testimony before the grand jury on February 6, 1985. More importantly, such post-arrest statements by the defendant could not have been properly considered by the trial court at all in determining on the motion to quash and arrest whether there was probable cause for the defendant's arrest.

The trial court also stated fallaciously in its "findings" that before Detective Summerville and Detective Clemmons went to the defendant's home at 1 p.m. on February 5, 1985, "they knew how these victims came to there [sic] deaths and it was by criminal activity. They didn't know then of the burglar bars, bars across the front." Again, there was no such testimony from Detective Summerville or Detective Clemmons as to whether they did or did not know about burglar bars across the front of Raynard Rule's home. Here, again, the trial court is apparently using some statement of the defendant, to support its finding of probable cause and, as I have said, the law does not permit but indeed prohibits such bootstrapping.

Finally, the trial court stated, "At this point the court will find, notwithstanding the background of criminal activity of the *defendant* James Davis [James Davis was never a defendant in this case] the detectives had a right to rely on the statements of James Davis, at least to corroborate the details related, notwithstanding the fact that he recanted his testimony under oath." (Emphasis added.) Again, the trial court was confused as to what the evidence had been. No witness testified that James Davis' alleged communications and information "corroborate[d] the details related."

At no place in the record, however, did the trial court display his utter obfuscation and bewilderment with what the evidence had been on the motion to quash and suppress than when the trial court made the following statement:

> "Fifthly, that James Davis told the detectives, that is one or the other of those detectives or perhaps both, that he didn't know the last name of Little Charles but that Little Charles and Virgil were related and went to Orr High School. Now a signed statement to this effect was given by James House [sic], and in the hearing before this court, that statement was repudiated on the basis, number 1, that he didn't make the statement to the police officers. He denied anything about the details of the signed statement, that he admitted that he had known Derrick House for two years but that Derrick House is not his friend, and that police officers told him what to say."

The following testimony of Detective Summerville, however, on the motion to quash and suppress evidence had been precisely to the opposite effect with regard to "a written" statement by James Davis:

> "Q. You took a statement from James Davis, is that correct?

A. Yes, sir.

Q. You interviewed Mr. Davis, is that correct?

A. Yes, sir.

Q. Did you ever ask that the statement, interview be reduced to writing?

A. No, sir.

Q. Did you ever ask that Mr. Davis attest to, sign, affirm, or otherwise affix his signature to the statement as your version of it was?

A. Did I ever ask him to do that?

Q. Yes.

A. No, sir.

Q. Did you ever show him what you had written down or any notes or memorandum or the like that you took with regards to that statement?

A. Any notes that were taken were taken in his presence.

Q. Did you take any notes with regard to his statement?

A. I didn't, no, sir.

Q. Was anyone else present when you took the statement from Mr. Davis?

A. Detective Capesius.

Q. Did you observe Detective Capesius make any notes while he was interviewing or while you were interviewing Mr. Davis?

A. I don't remember, sir.

Q. Is there any reason why you didn't reduce this statement to writing and give it to Mr. Davis to review and sign?

A. It is not necessary.

Q. Why is it not necessary?

A. It is not necessary. We don't—it is something you don't have to do."

After the trial court had rendered its finding that probable cause existed for the arrest of the defendant, that the defendant was arrested in his home on February 5, 1985, at 1 p.m., and that the defendant's subsequent grand jury testimony would be admissible on the trial, the defense attorney requested the trial court to make certain findings of fact in accordance with section 114—12(e) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, 38, par. 114—12(e)). That section provides: "The order or judgment granting or denying the motion shall state the findings of fact and conclusions of law upon which the order or judgment is based."

The defense attorney pointed out to the trial court that James

Davis had made no written statement, signed or otherwise. The trial court's answer to this was, *"I'm not aware of that.* Where is your transcript. Does anyone have a transcript? *The trial court perhaps did not get all its notes down."* (Emphasis added.) The court, in apparent disbelief, said to the assistant State's Attorney, *"No written statement? Is this correct?"* (Emphasis added.) To which the assistant State's Attorney stated, *"I believe so. I believe when the court made its ruling it might have confused the written statement of Virgil Bridges. Virgil Bridges, he made a written statement."* (Emphasis added.) The trial court then compromisingly concluded: *"I will have to vacate these findings at least tentatively until I have them, until it stands together."* (Emphasis added.)

Next, the defense attorney asked for factual findings with respect to the trial court's finding that James Davis gave a physical description of Charles Green, because the State had produced no evidence of such physical description, nor any other evidence that Charles Green fit the physical description given by James Davis. The defense attorney stated: "There was no evidence to that and I'm asking for a finding as to that fact." The trial court's response was, *"Was there testimony to this event, this fact?"* (Emphasis added.) The trial court then went on to state *"If I have mis-quoted, if I have relied on things that are not true, I'll have to vacate it."* (Emphasis added.)

The trial court appeared helpless in its predicament: *"Was there a written—was James Davis, was he asked to sign any written statement, yes or no? Who can answer that? Did the testimony show that James Davis was asked to sign a written statement? You're going to have to give me some help on this."* (Emphasis added.) Finally, the trial court appeared to have been confused about what its *own findings* were: *"In my findings just now made did I indicate that there was a written statement?"* (Emphasis added.) At last, the trial court abandoned any pretense of attempting to be accurate, and after realizing that no transcript of the testimony on the motion to quash and suppress was then available, allowed its obfuscated "findings" to stand: *"I can take care of that because there's no testimony upon which I can review as to what the actual description of James Davis—*strike that*—of Little Charles was *** there's no testimony here. I think—I don't know. I'll have to make these findings because I think the transcript would show that."* (Emphasis added.) Thus, though *both* the prosecution and defense attorneys agreed that the trial court had *erroneously* "found" that James Davis had made a written statement, the trial court nonetheless per-

mitted this erroneous finding to stand simply because no one had an available transcript to contradict it.

I recognize, of course, the rule that a court of review may reverse a trial court's finding on a motion to suppress only if those findings are "manifestly erroneous" or "clearly erroneous." (*People v. White* (1987), 117 Ill. 2d 194, 209.) Even if the trial court had been clear and concise in its findings, and even if those findings had been supported by the evidence, I still would not be persuaded that the "clearly erroneous" standard should be applied in the unique circumstances present here, that is, where *both* the prosecutor and the defense attorney agree and argue, before, during and after the suppression hearing that probable cause did not exist to arrest the defendant, and contrary, to the agreement and argument of the attorneys, the trial court made its own contrary findings that there was probable cause for the defendant's arrest. My research has not disclosed a similar situation in Illinois jurisprudence. But assuming without conceding that the "clearly erroneous" standard is the proper one, I am fully persuaded that, as the parties agreed below, there was no probable cause to arrest the defendant, and that, in any event, the trial court was so obviously confused by the evidence on the motion to suppress that it cannot be fairly said what testimony the trial court credited and what it discredited. The suppression hearing testimony can be read but it cannot be determined from this record what the trial court thought it had been, and it is highly unlikely, with all due deference, that the testimony was at all clear in the trial court's mind.

I am constrained to point out that it is quite unique in the case at bar that, and my research reveals no other case in which, every purported conversation, on which the arresting officers allegedly relied to establish probable cause to arrest the defendant, was denied, under oath, in open court by each person to whom the officers attributed the conversations.

The arrest of this defendant was illegal, without probable cause, and his arrest should have been quashed and his statements should have been suppressed. The fourth amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons *** against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." (U.S. Const., amend. IV.) This amendment is applicable to the States through the fourteenth amendment. (*Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684.) In *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248,

the police were investigating a murder, and one of the investigating officers ordered other detectives to "pick up" the defendant and "bring him in." The defendant was taken into custody, not told that he was under arrest, and driven to police headquarters and questioned. Thereafter he was given his constitutional warnings pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, waived those rights, eventually incriminated himself, and the defendant's statements were used against him at his trial. The State of New York, like in *the trial court here* in the State of Illinois, contended that the seizure did not amount to an arrest, and therefore was permissible because the police reasonably believed that the defendant possessed "intimate knowledge about a serious and unresolved crime." (*Dunaway*, 442 U.S. at 207, 60 L. Ed. 2d at 832, 99 S. Ct. at 2254.) In holding that the detention of Dunaway could not be distinguished from an arrest, the Supreme Court used language pertinent to the case at bar:

> "[T]he detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room." 442 U.S. at 212, 60 L. Ed. 2d at 835-36, 99 S. Ct. at 2256.

Relying upon *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the Court once again disapproved of arrests for "investigatory" purposes on less than probable cause. The Supreme Court refused to permit introduction of *Dunaway's* self-incriminatory statements, stating:

> "The situation in this case is virtually a replica of the situation in *Brown*. Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance. *** To admit petitioner's confession in such a case would allow 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the "procedural safeguards" of the Fifth.' " 442 U.S. at 218-19, 60 L. Ed. 2d at 840, 99 S. Ct. at 2260.

See also *Alabama v. Taylor* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664; *Lanier v. South Carolina* (1985), 474 U.S. 25, 88 L. Ed. 2d 23, 106 S. Ct. 297.

In *People v. Townes* (1982), 91 Ill. 2d 32, police officers investigating a rape visited the defendant at his home at approximately 9 a.m. on the day following the incident. The defendant was told that

the officers wished to speak with him at the police station, and when the defendant asked the reason, the officers informed him that they were investigating an entry into an apartment and an assault on a woman. The defendant was given the choice of accompanying the officers in the police car or driving his own car to the station, and the defendant elected to ride with the policemen. At the station the defendant was questioned on several occasions and ultimately made statements admitted against him at his trial. As in the case at bar, "[t]he State concede[d] that the police lacked probable cause to arrest the defendant at the time they visited his residence. However, [the State] argued that a finding of probable cause is unnecessary because defendant was never 'seized' within the meaning of the fourth amendment." (91 Ill. 2d at 38.) Our supreme court rejected the State's argument, and, relying upon *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, stated that the defendant's statements were inadmissible: "Similarly, in the instant case, the defendant's detention resembled a traditional arrest, and the circumstances indicate that a reasonable person would not have believed he was free to leave. As previously noted, defendant was not questioned briefly at his residence." 91 Ill. 2d at 37.

*People v. Franklin* (1987), 115 Ill. 2d 328, bears more than a facial similarity to the case at bar. *Franklin* was a bench trial for murder. The defendant in *Franklin* met the police on the street and accompanied them to the police station. He was allowed to go home, but when he failed to appear the next day for his scheduled polygraph examination police detectives went to his residence and "asked or ordered the defendant to stay at the station overnight *** and he spent the remainder of the night in an interview room." (115 Ill. 2d at 331.) Subsequently the defendant made self-incriminatory statements which he moved to suppress at the trial. The trial court denied the motion to suppress, concluding that the defendant had stayed voluntarily overnight at the police station and had voluntarily confessed. Despite testimony from the police officers that the defendant was not a suspect in the murder at the time he was taken to the station, our supreme court noted, "The apparent purpose of the defendant's arrest and detention was to enable the police to conduct an expedition for evidence in the hope that something might turn up, a practice that the Supreme Court has condmened." 115 Ill. 2d at 335.

Two recent appellate court cases should be mentioned, especially since one, *People v. Ealy* (1986), 146 Ill. App. 3d 557, 497 N.E.2d 101, was written by the author of the instant majority opinion, Jus-

tice Murray, and the other, *People v. Holveck* (1988), 171 Ill. App. 3d 38, 524 N.E.2d 1073, was authored by the other member of the majority in the case at bar, Justice Lorenz. In *People v. Ealy*, the defendant was convicted of murder. Investigating the murder, the police arrived at the defendant's home without a warrant and asked to speak to the defendant. The defendant's mother invited the officers in and sent her younger son to get the defendant, who was outside in the playground area of the building. When the defendant arrived, the detectives asked him if he would come to the station with them. Both detectives testified that they did not tell the defendant that he had to go with them, and the defendant never indicated he did not want to go with them. The officers testified that the defendant was not handcuffed, that they did not pull their guns on him, and he was taken in a squad car to Area 4 and placed in an interview room on the second floor. The officers testified they did not give the defendant his *Miranda* warnings at that time. When the defendant's mother came to the station to inquire about her son, the officers testified they told her about inconsistencies between the defendant's and her account of the defendant's whereabouts on the day of the murder. Contrary to the defendant's mother's testimony, they then asked the defendant's mother if she would speak to the defendant about her story and she agreed. Contrary to the defendant's testimony, however, the officers further testified that when they asked the defendant if he would speak with his mother he refused to do so. Later, the defendant confessed, and the trial court denied the motion to suppress the confession. On appeal the defendant argued that the police lacked probable cause to arrest him at the time they took him from his residence, and therefore, his confession and other incriminating evidence which were the fruits of his illegal arrest should be suppressed. As noted, Justice Murray wrote the opinion for a unanimous court in *People v. Ealy*, in which he therein stated:

> "An arrest occurs when the police detain a person in a manner such that a reasonable, innocent person in the same situation would not consider himself free to go. [Citation.] All evidence directly traceable to an arrest made without probable cause must be suppressed where there are no intervening events to break the connection between a defendant's illegal detention and the evidence obtained as a result therefrom. [Citation.]

> Here, the State concedes that no probable cause to arrest defendant existed at the time he was taken from his resi-

dence, but argues defendant was not 'seized' at that time so as to require probable cause. Instead, the State argues that defendant was not considered under arrest until 4 a.m., at which time probable cause existed, and that defendant's consent to the searches and his confession were voluntarily made. ***

\* \* \*

We find that the circumstances in the present case are more analogous to those in *People v. Townes* (1982), 91 Ill. 2d 32 ***." *People v. Ealy,* 146 Ill. App. 3d at 564-65.

Mr. Justice Murray went on in *People v. Ealy* to analyze and compare *People v. Townes* and *Dunaway v. New York,* and then concluded:

"We believe the circumstances in the instant case present far more compelling reasons than *Townes* for requiring reversal of the trial court's judgment. Here, in addition to the obvious similarities of this case and *Townes,* the police continuously interrogated the defendant eight times during an 18-hour period—three interrogation sessions more and six hours longer than the interrogation of the defendant in *Townes.*" 146 Ill. App. 3d at 565.

In *People v. Holvek* (1988), 171 Ill. App. 3d 38, 524 N.E.2d 1073, an opinion written by Mr. Justice Lorenz, the defendant was convicted of deviate sexual assault and unlawful restraint. The police stopped the defendant as he was driving his car and asked him if he would go with them to the police station to answer some questions, and the defendant responded "sure." He drove his own car to the police station. The police officer's testimony was that he "invited" the defendant to come to the station and the defendant agreed. The officer testified that the defendant was free to leave after being stopped, that the officer had not drawn his weapon, handcuffed the defendant, or searched the defendant. At the trial level, the State advanced the theory that the defendant had consented to go to the station and to be questioned, and, in fact, offered to stipulate that the initial stop of the defendant was not based upon probable cause. The trial court found the defendant had consented to go to the police station for questioning, noted that normal arrest activities such as booking and searching the defendant had not taken place prior to his making the incriminating statements, and, accordingly, denied the defendant's motion to suppress the statements which he had made at the station. In *Holvek,* which is factually very similar to the cause at bar, Mr. Justice Lorenz speaking for a unanimous court

said:

> "The issue before us is whether the trial court correctly found that defendant was not arrested prior to making the first incriminating statement, but instead voluntarily consented to accompany police to the police station and submit to questioning. *** It is also well established that where there are significant indicia of coercion, a court will not find controlling the fact that a defendant was merely asked if he would accompany the police [citations] or that he was not told that he was under arrest or made to undergo booking procedures [citation]. ***

> *** [W]e find that clearly a reasonable innocent man confronted with this situation would have believed that he was not free to leave at the time that the police began their questioning.

> This finding is reinforced by the apparent purposefulness of the police conduct. The State has conceded that the officers had no probable cause to arrest the defendant when he was stopped. Officer Buschbacher admitted that defendant was committing no crime and he had no basis for arresting the defendant." 171 Ill. App. 3d at 46-48.

Mr. Justice Lorenz concluded that "the seizure of the defendant appears to have been investigatory in nature, calculated to elicit information from him." (171 Ill. App. 3d at 49.) Therefore, ruled the *Holvek* court, the cases cited, together with *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, mandated that the trial court erred in failing to quash the defendant's arrest and to suppress the statements elicited from him during his interrogation following that arrest. It must be noted that the defendant in *Holveck*, unlike the defendant in the case at bar, was an adult. These authorities, and a myriad of others, such as *People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635, *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, *People v. Haymer* (1987), 154 Ill. App. 3d 760, 403 N.E.2d 781, and *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781, compel but one conclusion: The fourth amendment to the Constitution of the United States will not countenance the interruption and interference with the liberty of a citizen, in the absence of a warrant or probable cause, "to elicit information," or "for investigation," or for any other synonymous euphenism.

## IV

On the hearing of the defendant's motion to quash his arrest and suppress his uncounseled grand jury statement, the trial assistant State's Attorneys were confronted with an oxymoronic, diabolical dilemma. If the defendant was arrested for the quadruple murders by the officers at the defendant's home and was under arrest therefor while he was at the police station and when he was summoned without counsel and gave his incriminating statement before the grand jury, the only evidence available to the prosecution to convict the defendant, the defendant's incriminating grand jury statement, was inadmissible against the defendant at trial because it was obtained in violation of the defendant's constitutional rights to counsel, not to be a witness against himself and not to be compelled to incriminate himself. Conversely, the trial assistant State's Attorney apparently theorized that if the defendant was not arrested in his home by the officers, was not under arrest but was voluntarily in the police station and voluntarily appeared without counsel, although only 16 years of age, and gave his incriminating statement before the grand jury, the defendant's volunteered, incriminating grand jury statement would be therefore admissible against the defendant at his trial for the murders. The trial court bifurcated both contentions and applied segments from each. It held that the defendant was arrested at his home but his incriminating grand jury testimony nevertheless was admissible. The majority in this court adopts both contentions, without the bifurcation.

It is of little wonder that the trial assistant State's Attorneys contended in the trial court that there was no probable cause for Charles Green's arrest. They recognized the deficiency in their proof on this issue. The assistant State's Attorneys admitted there was no probable cause to arrest the defendant and proceeded to argue an entirely different theory from the one advanced by the appellate assistant State's Attorney in this court on behalf of the State. In the trial court, the State argued the various alleged inconsistencies between the defendant's witnesses' testimony and the assistant State's Attorney concluded: *"The People's evidence has shown that when Charles Green was taken to the station it was for the purpose of conducting an investigation \*\*\*."* (Emphasis added.) As to the arrest report statement that the defendant was arrested at 1300 hours, February 5, 1985, the assistant State's Attorney argued that this was *"just a mistake in the paperwork."* (Emphasis added.) The assistant State's Attorney argued further that the accepted test of

whether the defendant believed that he was under arrest when he left the apartment was "what [a] reasonable man innocent of any crime would have thought had he been in the defendant's shoes," and then the assistant State's Attorney proceeded to argue that a *reasonable person "in the defendant's shoes" would not believe he was under arrest.* (Emphasis added.) He further argued that any belief by the defendant that he was under arrest would have been an unreasonable belief. Then the assistant State's Attorney concluded, *"I suggest, therefore, that the defendant was not under arrest when he was taken to the police station.* \*\*\* The second component of the arrest concerns the intent of the police officers. *It was not the intent of the police officers, that is Detective Summerville nor Detective Clemmons, to arrest Charles Green in the apartment."* (Emphasis added.) The trial assistant State's Attorney continued to argue throughout his presentation that the defendant was not arrested, but had merely been asked "to come down to the police station to aid in an investigation," and that under the circumstances shown by the evidence to exist:

> "[T]o hold that this amounted to an arrest would be to hold that virtually any stationhouse interrogation is necessarily so custodial as to indicate that the person questioned has been placed under arrest. *This would mean that the police could not request the presence of anyone even for non-custodial questioning unless and until they had probable cause.* And I suggest to the court that there is no such reason to restrict the investigatory function to the police. \*\*\* When was the defendant arrested? I suggest to the court he was arrested and placed in custody after he testified at the Grand Jury \*\*\* the court has learned about the statement made by the defendant Charles Green that he gave before members of the Grand Jury and *I suggest that that statement, along with all the other evidence that the police had at that time has provided the probable cause to arrest this defendant Charles Green."* (Emphasis added.)

Thus, nothing could be clearer than that the State's position at the trial level was that the police did not have probable cause to arrest the defendant when they went to the defendant's home at 1 p.m., February 5, 1985; the officer did not arrest the defendant at that time, but merely requested the defendant's assistance in their homicide investigation. Indeed, the trial court alluded to this in its findings when it denied the motion to quash and suppress as fol-

lows: "The State's position appears to be that the defendant was not arrested until after he was taken before the Grand Jury on February 6, 1985 ***."

It is impossible to reconcile the State's position in the trial court with its brief in this court wherein, after recounting Detective Summerville's misrepresentations as to what James Davis allegedly told him about the defendant (see part III, *supra*) the People proclaim in this court:

> "Given the fact the reasonableness of the police officer's conduct in making an arrest must be judged on the basis of their responsibility to prevent crime and apprehend criminals, *the police in this case would have been remiss if they did not take the defendant into custody and question him concerning his involvement in the murders."* (Emphasis added.)

As I have shown from the mouths of the trial assistant State's Attorneys, the theory of the State at the trial level was that the entry to the defendant's home was peaceful and consensual; the defendant was not arrested in his home but merely invited to come to the police station to aid in a homicide investigation; voluntarily remained with the authorities for 27 hours; and then testified voluntarily before the grand jury, after which he was promptly arrested. Preposterous as was the State's theory at trial, at least it had the merit of being based on its view of the testimony of its own witnesses and possessed a degree of consistency. But on appeal, the State has taken a 180 degree turn contending that the officers not only arrested the defendant at his home on February 5, 1985, but the officers would have been "remiss" if they had done the precise things they testified they did do, *i.e.*, not arrest the defendant, allow him to go home if he wished, etc. What can explain this total oxymoronic dichotomy?

The explanation for the State's contention in the trial court that the police lacked probable cause to arrest Charles Green in his home on February 5, 1985, undoubtedly was based upon two factors: (1) the trial assistant State's Attorneys recognized that the cross-examination of Detective Summerville had so undercut his misrepresentations on direct examination that the assistant State's Attorneys had no confidence in urging that probable cause existed to arrest the defendant, and they therefore sought to preserve the admissibility of the defendant's subsequent grand jury statement by contending that it could not be the "fruit" of the defendant's illegal arrest because the defendant had not been arrested at all, instead he was merely a

cooperating citizen voluntarily providing the police with information; and (2) the trial assistant State's Attorneys recognized that incriminating statements made by an arrested person without counsel before a grand jury are not admissible on his trial (see part V, *infra*), whereas such statements are admissible if made by a witness *not* under arrest. Thus it was mandatory, from the State's point of view, to establish that the defendant was *not* "in custody" when he testified before the grand jury.

The trial court was so singularly unimpressed with the State's argument that he took perhaps the unprecedented step (my research discloses no similar case), of "finding" that there was probable cause for the arrest of the defendant on February 5, 1985, at 1 p.m., despite the urging of *both* the prosecutors and the defense attorney that there was no probable cause to arrest the defendant. A pertinent question, then, is whether the State may be permitted to contend and concede in the trial court that there was no probable cause to arrest the defendant, and that the defendant was not arrested at all, and then conversely contend and urge in the court of review the exact opposite—that there was probable cause to arrest the defendant and indeed the officers did so in defendant's home on February 5, 1985, and that they were fully justified in doing so; indeed, would have been "remiss" if they had not done so.

I consider the State's retroverse brief and argument in this court not only degrading to the integrity of the profession by its reliance upon Detective Summerville's misrepresentations concerning probable cause, but insulting to the intelligence of the members of this court as well. Every witness for the State who was asked, including an assistant state's attorney (John O'Donnell), unambiguously testified that the defendant was not restrained or deprived of his freedom until *after* he testified before the grand jury on the late afternoon of February 6, 1985, and that at all times until then the defendant remained free to go home if he wished. Yet, in this court the State's brief tells us that if the authorities had done precisely what they swore they did do they would have been "remiss" in their duties. This is more than capricious inconsistency. Implicit in an acceptance of the State's present argument in this court is the inescapable conclusion that the State's witnesses committed perjury when they swore the defendant was not arrested on February 5, 1985, was not restrained in any manner, and was at all times free to leave the police station and go home if he wished. The *only* testimony in the entire record on the motion to suppress which supports

the proposition that the defendant was arrested at 1 p.m. on February 5, 1985, in his home (the State's *present* argument) *came from the defendant and his witnesses*—the very testimony which the assistant State's Attorney below went to such great lengths in his argument to discredit and urged the trial court to reject. In other words, to uphold the State's position in *this* court we would be required to credit only the defense witnesses and to discredit all the State's witnesses. But the State's dilemmatical predicament is of its own making, and I find it disingenuous.

The answer to the foregoing question, whether the State may contend and concede in the trial court that there was no probable cause to arrest the defendant and that the defendant was not arrested at all, and then conversely contend and urge in this court of review the exact opposite—that there was probable cause to arrest the defendant and indeed the officers did so in the defendant's home on February 5, 1985—is clearly *"No,"* and for several reasons, the major one of which is that it would be obnoxiously unfair to a defendant. The defendant below concentrated his efforts on attempting to convince the trial court that he was arrested without probable cause in his home at 1 p.m. on February 5, 1985, as he and his witnesses so testified and as the arrest report—the one relevant document which *is* in the record on appeal—so states. Because of the State's concession that the detectives lacked probable cause to arrest the defendant, the defense made little or no effort to cross-examine Detective Summerville or Detective Clemmons in this area, or to call witnesses to establish the lack of the very element which the State had already conceded was indeed absent. It must be remembered in this regard that once the defendant offered evidence that he was arrested in his home without a warrant at a time when he was violating no law the burden was on the State to prove the lawfulness of the arrest. (*People v. Nash* (1979), 78 Ill. App. 3d 172, 177, 397 N.E.2d 480, 484; *People v. Boston* (1979), 73 Ill. App. 3d 107, 111, 391 N.E.2d 503, 506; *People v. Talley* (1975), 34 Ill. App. 3d 506, 340 N.E.2d 167.) As Justice Lorenz said in *People v. Watson* (1986), 145 Ill. App. 3d 492, 499, 495 N.E.2d 1153, 1158: "Once a defendant establishes the illegality of the arrest and its connection with the alleged fruit, the prosecution has the burden of establishing by clear and convincing evidence that the challenged statement was obtained by means sufficiently distinguishable to be purged of the primary taint." Certainly the State should not be permitted to sustain its burden of proving the lawfulness of the defendant's arrest

by arguing in the trial court that there was and had been no arrest. Our supreme court has commented many times on this fundamental concept that it is basically unfair to a defendant for the State to raise an issue for the first time on appeal. In *People v. Holloway* (1981), 86 Ill. 2d 78, 91-92, for example, our supreme court said:

> "We turn next to the question of whether the State has waived its right to challenge the standing of defendant Moore. The State made no objection when counsel for defendant Moore orally joined in defendant Holloway's motion to suppress. Also, the State filed a motion to reconsider the court's ruling on the motion to suppress. Again, neither in the motion nor on its oral argument did the State raise the question of Moore's standing. Issues not raised in the trial court are generally considered waived on appeal. (*People v. Knight* (1979), 79 Ill. 2d 291, 300[, 388 N.E.2d 414].) The principle of waiver applies to the State as well as the defendant in a criminal case. (*People v. McAdrian* (1972), 52 Ill. 2d 250, 254[, 287 N.E.2d 688].) Had the State made a timely objection, defendant Moore may have been able to satisfy the court that he did, in fact, possess an interest in the premises sufficient to give him standing to object to the warrantless entry. As noted in *McAdrian*, one of the basic considerations supporting the rule preventing a party from raising issues for the first time on appeal is that '[t]he failure to urge a particular theory before the trial court will often cause the opposing party to refrain from presenting available pertinent rebuttal evidence' which could have a bearing on the disposition of the question. (*People v. McAdrian* (1972), 52 Ill. 2d 250, 254[, 287 N.E.2d 688]. See also *People v. McCullum* (1977), 66 Ill. 2d 306, 316[, 362 N.E.2d 307].) Consequently, we hold that the State has waived its right to challenge the standing of defendant Moore."

*Holloway* thus stands for the proposition that the State may not fail to object to the defendant's lack of standing to bring a motion to suppress, and then, on appeal, take the diametrically opposite position that the defendant lacked standing. This rule is applicable whether the State is the appellant from the granting of the motion to suppress, as in *People v. Weber* (1981), 98 Ill. App. 3d 631, 424 N.E.2d 874, or the defendant is the appellant from a denial of a motion to suppress, as in *People v. Chianakas* (1983), 114 Ill. App. 3d 496, 448 N.E.2d 620. A case directly on point is *People v. Franklin*

(1987), 115 Ill. 2d 328 (cited *supra* in another connection in part III). In *Franklin*, the defendant was scheduled to appear for a polygraph examination, and when he failed to keep his appointment, the police took the defendant to the murder victim's apartment, and then either asked or ordered the defendant to stay overnight at the station. The defendant spent the night in an interview room at the station and the next day was given the polygraph examination, was told that he failed it, and subjected to further questioning, whereupon he eventually confessed. On the defendant's motion to quash his arrest and to suppress his statements, the trial court concluded that the defendant had voluntarily stayed over night at the station and denied the motion to suppress. On appeal, the appellate court affirmed the denial of the motion to suppress but on a different ground: That the defendant had in fact been arrested, that the arrest was not supported by probable cause, but that the defendant's statements were nevertheless admissible because the statements were "sufficiently distinct from [the] illegal arrest to be free from the initial taint" of the illegal arrest. (115 Ill. 2d at 332.) After the defendant's petition for leave to appeal was granted by the Illinois Supreme Court, the State adopted several new theories: (a) That the polygraph examination had worked an attenuation of the taint of the illegal arrest, as the appellate court had held; (b) that the police misconduct in detaining the defendant for the purpose of conducting an expedition for evidence was not flagrantly abusive; (c) that the period of time between the defendant's arrest and his confession was not so lengthy that it aggravated the detention, nor so brief that it prevented the dissipation of the initial taint; and (d) that, in fact, the arrest of the defendant had been supported by probable cause. Thus, in *Franklin*, as in the case at bar, the State took one position in the trial court—that there had been no arrest of the defendant at all—and another position on appeal—that there had been an arrest of the defendant and that that arrest was supported by probable cause. The supreme court rejected the State's bid to flip-flop in *Franklin*:

> "The general rule that a prevailing party may raise, in support of a judgment, any reason appearing in the record does not apply when the new theory is inconsistent with the position adopted below or the party has acquiesced in contrary findings. [Citations.] We believe that in this case the State's probable-cause argument comes too late, for it directly conflicts with the State's theory at the pretrial hearing. The po-

lice officers testified that the defendant was not a suspect in the murder case until sometime on June 14 and that he did not commit any crimes in their presence on June 13. Furthermore, the defendant did not have an opportunity to develop a factual record in opposition to the new theory." 115 Ill. 2d at 336.

In *People v. Wetherbe* (1984), 122 Ill. App. 3d 654, 462 N.E.2d 1, the defendant was stopped while driving his car, the car was searched, and stolen equipment found. The State sought to justify the seizure on the ground that the police officers were conducting a lawful inventory of the items in the car. The trial court concluded the inventory procedure was in fact an investigatory search and sustained the motion to suppress evidence. On appeal, the State changed its theory and sought to justify the seizure as being incident to a valid arrest. Omitting citations, the court held,

"If the search had been made on the basis of probable cause, Guzlas [the police officer] would have been able to search the entire vehicle, including the trunk [citations], even after Guzlas had taken custody of the car [citations] and regardless of the validity of defendant's arrest. [Citation.] However, as the State did not claim at trial that the search was based on probable cause, this ground has been waived as a basis for justifying the search." 122 Ill. App. 3d at 656.

Thus the State may not change its position on appeal when to do so would deprive the defendant of a fair opportunity to develop a factual record in order to challenge the new belated State contention, or when the State's position on appeal is inconsistent with its position at the trial level.

The majority, like the State, seeks, to employ a common metaphor, "to have its cake and eat it too." Just as the State argued to the trial court that *there was no probable cause* to arrest defendant, and subsequently to this court that *there was probable cause* to arrest him, the majority opinion engages in the same convoluted rationale. The trial court found that the defendant had been arrested on February 5, 1985, at 1 p.m. in his own home. Thus much is acknowledged by the majority opinion. In order to sustain the trial court's finding, the majority of this court holds as follows:

"[W]e hold that the trial court's finding of probable cause to arrest defendant was not against the manifest weight of the evidence." 179 Ill. App. 3d at 11.

But then the majority reaches a contrary conclusion when dis-

cussing the applicability of the Juvenile Court Act to this case. Section 703—2(2) of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2(2)) provides:

> "A law enforcement officer who takes a minor into custody without a warrant *** shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed."

While noncompliance with this section has been held not to *automatically* render a juvenile's confession inadmissible (*In re Stiff* (1975), 32 Ill. App. 3d 971, 978, 336 N.E.2d 619, 625), the failure to comply with this section is an important consideration in determining whether a juvenile defendant's statements were voluntary under the totality of the circumstances. See, for example, *People v. Cole* (1988), 168 Ill. App. 3d 172, 179, 522 N.E.2d 635, 639, *People v. McGhee* (1987), 154 Ill. App. 3d 232, 236, 507 N.E.2d 33, 35, *People v. Travis* (1984), 122 Ill. App. 3d 671, 677, 462 N.E.2d 654, 658-59, and *In re S.D.S.* (1982), 103 Ill. App. 3d 1008, 1012, 431 N.E.2d 759, 762, in which the court stated:

> "One of the most telling factors in the instant case is the age of the accused: he was a juvenile, 16 years old. We have noted on another occasion that our courts must be especially cautious in cases involving juveniles because the coerciveness of a situation is thereby enhanced. (*People v. Travis* (1984), 122 Ill. App. 3d 671, 676, 462 N.E.2d 654; see also *Haley v. Ohio* (1948), 332 U.S. 596, 599, 92 L. Ed. 224, 228, 68 S. Ct. 302, 303-04.) In response to the potential for abrogating the rights of juveniles, our legislature has enacted the Juvenile Court Act, which provides that when a juvenile is taken into custody, his parent or guardian and a youth officer should be immediately notified. (Ill. Rev. Stat. 1985, cha. 37, par. 703—2.) In this case, the police violated the Act by failing even to attempt to notify Cole's mother, and notified a youth officer only after he had been in custody for several hours." *Cole*, 168 Ill. App. 3d at 179.

The *undisputed* testimony in the trial court established that the police denied the defendant's mother permission to see her son while he was in the station on the evening of February 5, 1985, a clear violation of the statute. So, in order to circumvent section 703—2, and the case authorities applying it, I am utterly amazed to read (179 Ill. App. 3d at 13) in the majority opinion, that the same defendant who the majority just held (179 Ill. App. 3d at 11) was lawfully arrested in his home was not really arrested at all. But,

> "[W]e have determined that defendant was not taken into custody, but rather went to the police station of his own volition to answer questions." 179 Ill. App. 3d at 13.

Thus, we are told by the majority that in determining the defendant's fourth amendment claims, the defendant was lawfully arrested in his home, but for the purpose of determining the applicability of section 703—2, the defendant was not arrested at all! This is not possible, I submit. Either the defendant was under arrest when he was taken from his home, or he was not under arrest when he was taken from his home. If the defendant was under arrest when he was taken from his home, then certain questions must be answered, such as, whether there existed probable cause for his arrest; whether section 702—3 was violated, and if so, the effect thereof; whether the State may take an arrestee before the grand jury and secure self-incriminatory statements, etc. (On this latter, see part V, *infra*.) If the defendant was not under arrest when he was taken from his home, and he went "of his own volition" to the police station, then other questions must be answered, such as whether the trial judge's finding that defendant was arrested in his home was "manifestly erroneous," and the effect of Detective Summerville's aforementioned misrepresentations. But I submit the defendant could not have been placed under arrest in his home, and not arrested in his home; the defendant did not go to the station under arrest, and also "of his own volition." One or the other. But not both. The terms "arrest" and "volition" are irreconcilable terms characterized by contradictory and incompatible elements. No oxymoronic or imbrogliocal phraseology can turn hot into cold, day into night, fire into water or custody into freedom.

## V

The majority recognizes that an additional issue exists with respect to the defendant's appearance and testimony before the grand

jury which indicted him. Here again the majority opinion demonstrates its internal inconsistency. Having just ruled that the defendant was not under arrest, but went to the station of his own "volition" (179 Ill. App. 3d at 13), in order to avoid the consequences of section 703—2, and the misconduct of the police in refusing Viola Green access to her son on the evening of February 5, 1985, the majority thereafter reverses itself once again and holds that the defendant *was* under arrest, stating:

> "Defendant's last argument on this issue is that no probable cause existed to arrest him on February 6 because his statements to Assistant State's Attorney O'Donnell and before the grand jury on that day were not made voluntarily. ***
>
> Because we have determined that probable cause existed to arrest defendant on February 5, we need only address the voluntariness of defendant's statements on February 6." 179 Ill. App. 3d at 13-14.

No reasonable person, in my judgment, would deny, on the state of this record, that the defendant's liberty of movement was restricted, he was not free to leave, he was "in custody" when he left his home of February 5, 1985, at 1 p.m., and for the 27 hours in the police station thereafter, as that term has been defined by *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The trial court found that from the moment the defendant left his home he was under arrest. But the issue which the majority totally ignores is whether it is legally permissible to hold a person under arrest, particularly a juvenile, before a grand jury, and, without counsel, obtain incriminating statements, procure an indictment from the same grand jury, and then use those same statements to convict him at trial. I have not been able to locate, after extensive research, one single authority approving such outrageous prosecutorial misconduct which clearly violates *both* the fifth amendment guarantee against self-incrimination and the sixth amendment right to counsel. A case from our own supreme court, and, of course, binding upon us, flatly and vehemently rejects such a procedure, and, as I have said, I can find no case which approves it.

The fifth amendment of the Constitution of the United States guarantees that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." (U.S. Const., amend. V.) Arti-

cle I, section 10, of the Illinois Constitution provides that "[n]o person shall be compelled in a criminal case to give evidence against himself." (Ill. Const. 1970, art. I, §10.) In *People v. Boone* (1894), 148 Ill. 440, 36 N.E. 99, the defendant was indicted for murder. Prior to trial the defendant moved to quash the indictment "based on the fact that the defendant was taken from the jail and before the grand jury which found the indictment, and sworn as a witness, and examined as to the homicide." (148 Ill. at 446.) The supreme court of Illinois held:

> "The assignment of error first alleged is in overruling defendant's motion to quash the indictment, which was based on the fact that defendant was taken from the jail and examined as a witness before the grand jury that found the indictment against him, and was compelled to testify before said grand jury regarding his guilt or innocence. That motion is supported by the affidavit of the defendant. The grand jury constitutes a part of the court, and their official acts in finding true bills or ignoring bills are borne on the records of the court, and witnesses sworn before that body are sworn in open court, though not necessarily in the presence of the judge. [Citation.] By section 10 of article 2 of the constitution of the State of Illinois it is declared: 'No person shall be compelled, in any criminal case, to give evidence against himself.' When the disqualification of a defendant in a criminal case as a witness in his own case was removed by section 426 of the Criminal Code of Illinois, it was expressly provided 'that a defendant in any criminal case or proceeding shall only at his own request be deemed a competent witness, and his neglect to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect.' [Now Ill. Rev. Stat. 1985, ch. 38, par. 155—1.] The provision of the statute and the positive inhibition of the constitution alike preclude the right of the grand jury, or any court, to call upon the defendant, and, in the first place, make him a witness, and require him to give evidence against himself. It is of the highest degree of interest, and most important, to preserve that peculiar excellence of the common law system which has never allowed a proceeding to establish guilt to be inquisitorial. The affidavits in the record show that the defendant was taken from the jail where he was held in custody, and taken before the grand

jury, where he was examined touching the very matter on which that grand jury found an indictment against him and on which he was placed on trial. A right of the highest character was violated, a privilege sacredly guaranteed by the constitution was disregarded, and a dangerous innovation in the uniform practice in this State made. A danger so great, if it once became a rule of law, that one ignorant of his rights, and, it may be, also of his danger, unattended by counsel and unprotected by a court, could be called before a grand jury and interrogated, and, as he may believe, compelled to answer charges made against him on a subject matter of investigation then before that body, in which his interest is vital, that we will not stop to inquire into the question as to whether the indictment was found on that testimony alone, nor whether that testimony influenced the finding where, as here, the defendant is in custody charged with a crime, and whilst so in custody is taken from the jail to be examined about that subject matter. It is sufficient that so important a right was violated and such a proceeding had where an indictment was found under such circumstances.

But were that otherwise, it does not appear that any other evidence was heard before that grand jury on which this indictment was found. We do not hold that where one is before the grand jury as a witness, and at that time is not charged with crime, and may incidentally be interrogated about a matter, to which he makes answer, and an indictment afterwards is found against him, would require the indictment to be quashed; nor do we hold that every case where one is before the grand jury as a witness, and interrogated about a matter for which he may afterward be indicted, would be, of itself, sufficient cause to quash the indictment. But in this case it does not appear that the grand jury examined any other witnesses, nor does it appear the indictment was not found on the evidence of the defendant alone. No affidavits are filed by the State's attorney on that question, and where, as here, the defendant charged with crime is taken from the jail and before the grand jury, and interrogated about the matter with which he is charged with crime, such an error must be held fatal to the indictment. It was error to overrule the motion to quash the indictment." 148 Ill. at 448-50.

Cases such as *United States v. Washington* (1977), 431 U.S. 181,

52 L. Ed. 2d 238, 97 S. Ct. 1814, and *In re J.H.* (1987), 164 Ill. App. 3d 718, 518 N.E.2d 249, are not applicable to the instant cause for several reasons. In neither *Washington* nor *In re J.H.* was the defendant under arrest when taken before the grand jury. Furthermore, in *In re J.H.*, after noting that the defendant was not under arrest at the time he was taken before the grand jury, the court also noted, "While such allegations of fourth, fifth, and sixth amendment violations may be an appropriate basis upon which to grant a motion to suppress evidence, we do not believe that they constitute sufficient justification for dismissal of the grand jury indictment in the present case." (164 Ill. App. 3d at 724.) Here, of course, the defendant's motion was based upon the fourth, fifth and sixth amendments, and it was a motion to suppress evidence of statements, not a motion to quash the indictment. Also, in *In re J.H.*, there was additional evidence presented to the grand jury which returned that indictment.

The sixth amendment guarantees that "In all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence." (U.S. Const., amend. VI.) If the arrest of the defendant in his home was not supported by adequate probable cause, as I believe it was not, then the defendant's grand jury testimony should have been suppressed as a product of a fourth amendment violation, his illegal arrest. If, on the other hand, defendant's arrest was supported by probable cause, as the trial judge so held, then section 703—2 mandates the procedures which must take place in the case of this juvenile.[2]

There simply is no statute or other authority which permits an arrested juvenile to be taken before a grand jury and interrogated. Interrogation before a grand jury is altogether distinguishable from interrogation in a police station, even assuming that the police and assistant State's Attorneys may violate section 703—2 with impunity. The long history of the grand jury, extending back more than 900 years, and the rights of witnesses before grand juries trace their evolution from the Magna Charta, and has been exhaustively recounted in many volumes. (See *e.g.* 1 F. Pollock & F. Maitland, The History of English Law (2d ed. 1923).) In Illinois, special protections involving the right to counsel which attach to the appearance of potential defendants, and even to mere grand jury witnesses, are

---

[2]For adults, the proper procedure is delineated in section 109—1 (Ill. Rev. Stat. 1985, ch. 38, par. 109—1).

set forth in sections 112—4 and 112—4.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, pars. 112—4, 112—4.1). Those sections provide:

"Any person subpoenaed who is already charged with an offense or against whom the State's Attorney is seeking a Bill of Indictment shall have the right to be accompanied by counsel who shall advise him of his rights during the proceedings but may not participate in any other way. Before any testimony is given by such a person, he shall be informed that he has the right to refuse to answer any question that will tend to incriminate him, that anything he says may be used against him in a court of law, that he has the right to be accompanied and advised of his rights by counsel, and that he will have counsel appointed for him if he cannot afford one." Ill. Rev. Stat. 1987, ch. 38, par. 112—4.

Section 112—4.1 provides:

"Any person appearing before the grand jury shall have the right to be accompanied by counsel who shall advise him of his rights but shall not participate in any other way." Ill. Rev. Stat. 1987, ch. 38, par. 112—4.1.

Even if *People v. Boone*, involving the guarantee against self-incrimination were not on the books, the sixth amendment right to counsel would, *independently of the fifth amendment*, prohibit compelling an arrestee (and most particularly a 16 year old, to whom we owe special care because juveniles could be "easy victim[s] of the law" (*Haley v. Ohio* (1948), 332 U.S. 596, 599, 92 L. Ed. 224, 228, 68 S. Ct. 302, 303-04)), to appear before the grand jury without counsel to advise them. The sixth amendment and the above Illinois statutes require that when an unrepresented involuntary "target witness" is compelled to appear before the grand jury that "target witness" is confronted with a "critical stage" of the proceedings against him; it is an occasion when legal advice is most critically needed.[3] The proceeding in which the arrestee appears before the

---

[3]Many rights and privileges other than the guarantee against self-incrimination may be involved in a grand jury appearance. Volumes have been written concerning the complex nature of grand jury proceedings. (See, *e.g.*, S. Beale & W. Bryson, *Grand Jury Law & Practice* (Callaghan 1986); Grand Jury Project, Inc., of the National Lawyers Guild, Representation of Witnesses Before Federal Grand Juries (1985 through 1988).) It strikes me that even the most intelligent and sophisticated adult layman could not intelligently comprehend the intricate nuances of grand jury litigation without legal assistance. Just recently, our supreme court touched upon

grand jury has clearly moved from the investigatory to the accusatory stage, and thus the "target witness" is confronted with a "critical stage" of a criminal prosecution such that he cannot intelligently waive his right to the assistance of counsel except in the presence of counsel.

The Supreme Court of the United States for many years rejected various opportunities to determine whether the sixth amendment operates independently of the fifth amendment so as to require, of its own force, the suppression of evidence secured in violation of the right to counsel. (See, for example *Moran v. Burbine* (1986), 475 U.S. 412, 428 n.2, 89 L. Ed. 2d 410, 425 n.2, 106 S. Ct. 1135, 1145 n.2; *Brewer v. Williams* (1977), 430 U.S. 387, 405-06, 51 L. Ed. 2d 424, 441, 97 S. Ct. 1232, 1243.) In *Michigan v. Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404, the Supreme Court held that where the defendants had been arraigned, and requested counsel, but were interrogated by the police before they were able to consult with counsel, their statements were inadmissible as being the product of the violation of their sixth amendment right to counsel. The Supreme Court emphasized that that defendants' right to counsel operated *independently* of the fifth amendment guarantee against self-incrimination, but again refrained from clarifying the precise parameters of each guarantee:

> "The State also argues that the Michigan Supreme Court's finding of a valid Fifth Amendment waiver should require the finding of a valid Sixth Amendment waiver. The relationship between the validity of waivers for Fifth and Sixth Amendment purposes has been the subject of considerable attention in the courts, [citation] and the commentaries [citation]. In view of our holding that the *Edwards* rule applies to the Sixth Amendment and that the Sixth Amendment requires the suppression of the postarraignment statements, we need not decide either the validity of the Fifth Amendment waiver in this case *** or the general relationship between Fifth and Sixth Amendment waivers." 475 U.S. at 635 n.10, 89 L. Ed. 2d at 642 n.10, 106 S. Ct. at 1411 n.10.

In the recent case of *Patterson v. Illinois* (1988), 487 U.S. ___, 101 L. Ed. 2d 261, 108 S. Ct. 2389, the defendant, *after indictment,*

---

the complexity of yet another possible privilege heretofore potentially available to grand jury witnesses. See *In re October 1985 Grand Jury Number 746* (1988), 124 Ill. 2d 466.

was given *Miranda* warnings, waived his rights thereunder and, in the absence of counsel, made incriminating statements to a police officer in the police station where he was being held preparatory to being transferred to the Cook County jail. The justices divided 5 to 4 on the issue of whether such post-indictment questioning violated the sixth amendment right to counsel independently of the fifth amendment right against self-incrimination, the majority holding that "it is our view that whatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning." (487 U.S. at ____, 101 L. Ed. 2d at 276, 108 S. Ct. at 2398.) But all nine justices agreed on one proposition:

> "[B]ecause the Sixth Amendment's protection of the attorney-client relationship—'the right to rely on counsel as a "medium" between [the accused] and the State'—extends beyond *Miranda*'s protection of the Fifth Amendment right to counsel [citation], there will be cases where a waiver which would be valid under *Miranda* will not suffice for Sixth Amendment purposes." 487 U.S. at ____ n.9, 101 L. Ed. 2d at 275 n.9, 108 S. Ct. at 2397 n.9.

The test approved by the *Patterson* majority as to whether the sixth amendment operates independently of the fifth amendment was lifted from *United States v. Ash* (1973), 413 U.S. 300, 313, 37 L. Ed. 2d 619, 628, 93 S. Ct. 2568, 2575, and is whether the procedure is one at which "the accused require[s] aid in coping with his legal problems or assistance in meeting his adversary." Thus, under the present state of the law, if counsel would *only* serve to guard against self-incriminatory statements by his client a *Miranda* warning is sufficient to waive the right to counsel. But if counsel is necessary to aid the client in "coping with legal problems or assistance in meeting the adversary," then a *Miranda* waiver is not sufficient to waive counsel. Under the *Patterson v. Illinois* test, clearly Charles Green was deprived of his sixth amendment right to counsel, which operated independently of his fifth amendment right not to incriminate himself, when he was arrested and without counsel taken before the Cook County grand jury. Clearly, at the moment he entered the grand jury room he required " 'aid in coping with legal problems or assistance in meeting his adversary.' " As such, the *Miranda* warnings which preceded his grand jury self-incriminatory testimony were insufficient to waive his right to counsel *at the grand jury*.

Actually, there is nothing new in this concept. In *United States*

*v. Wade* (1967), 388 U.S. 218, 226-27, 18 L. Ed. 2d 1149, 1157, 87 S. Ct. 1926, 1932, the court pronounced:

"[I]n addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. \*\*\*

\*\*\* It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice."

There is in reality no substantial difference between this case and *United States v. Doss* (6th Cir. 1977), 563 F.2d 265, where a defendant who had already been secretly indicted by the grand jury was called before the grand jury, given his *Miranda* warnings, and subsequently made incriminatory answers to questions put to him by the prosecutor, and which were used against him at his trial. Indeed, it might be argued that the conduct employed in *Doss* is somewhat less reprehensible because in *Doss* (1) the defendant's grand jury admissions were not used by the same grand jury to indict him (he had already been secretly indicted); and (2) Doss was not under arrest when he appeared. The court held the sixth amendment had been violated:

"Where a substantial purpose of calling an indicted defendant before a grand jury is to question him secretly and without counsel present without his being informed of the nature and cause of the accusation about a crime for which he stands already indicted, the proceeding is an abuse of process which violates both the right to counsel provision of the Sixth Amendment and due process clause of the Fifth Amendment." 563 F.2d at 286.

## VI

There is a final point to be considered. The police officers in this case, who took this 16-year-old defendant from his home on February 5, 1985, at 1 p.m., to the police station either *under arrest*, as the trial judge found, or *voluntarily*, as the assistant State's Attorney argued at trial, *or both* under arrest *and* voluntarily, as the majority herein has ruled, did not give the defendant his *Miranda* warnings either at his home or while he was being held at the sta-

tion. No witness, including Assistant State's Attorney George Ellison, who said he took a statement from the defendant on the evening of February 5, 1985, at the police station, testified that the defendant was given his *Miranda* warnings by anyone until Assistant State's Attorney John O'Donnell and the defendant confronted each other on the late afternoon of February 6, 1985, at the criminal courts building, some 27 hours after the defendant was taken from his home. The record on appeal reflects that the defendant made several statements to police detectives and at least one to Assistant State's Attorney Ellison (to the latter, a written signed court reported statement) on February 5, 1985, in the police station, but those statements and their contents are not contained or reflected in the record.

One of the serious questions which frightfully disturbs me in this case is whether the police and State's Attorney's Office may take a juvenile from his home, hold him at least 27 hours incommunicado from his family, deliberately[4] *not* advise the defendant of his *Miranda* constitutional guarantees, interrogate him, take "un-*Mirandized*" statements from him, then take him before a grand jury where he is advised of his *Miranda* rights and asked to repeat his previous "un-*Mirandized*" statements, and then use those grand jury statements against the defendant at his trial. If this procedure were permitted as an exception to the *Miranda* strictures, such an exception would figuratively swallow the rule. But that is exactly what the record shows was done in this case. And the State witnesses went to preposterous lengths in their testimony to "justify" their failure to give *Miranda* admonitions to this defendant. For instance, Detective Miller testified as a State witness on direct examination that when the defendant was in the police station he was not handcuffed, his "freedom of movement" was not restricted in any manner, no charges were lodged against him, and that if he had wanted to go home he would have been allowed to do so. This was of course, offered to show that the defendant was not "in custody" and thus no *Miranda* warnings were required.

---

[4]I use the word "deliberately" here advisedly. Surely no one would suggest that in 1985 experienced police detectives and/or Assistant State's Attorney Ellison were unaware of their obligations to advise persons under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. That duty and obligation placed by the Supreme Court upon law enforcement authorities is so well recognized that it would be totally unreasonable to conclude that the failure to comply with it could be other than purposeful.

"Q. Detective Miller, the entire time that Charles Green was at the police station on February 5, 1985 was he handcuffed?

A. No.

Q. Was his freedom of movement restricted in any manner on February 5, 1985?

A. No.

Q. If Charles Green wanted to go home on February 5, 1985, would you have let him go home?

A. Yes.

Q. On February 5, 1985 are you aware that an Assistant State's Attorney by the name of George Ellison came to the police station?

A. Yes.

Q. And are you aware that he interviewed the defendant Charles Green?

A. Yes, I am.

Q. Are you aware that after Assistant State's Attorney George Ellison spoke to Charles Green, are you aware whether or not any charges were filed by the State's Attorney's Office?

A. No charges were filed."

On cross-examination the defense attorney showed Detective Miller a copy of an arrest report bearing his *own signature* and he was asked:

"Q. Directing your attention to Box 22, does that state a date and time of arrest?

A. Yes, it does.

Q. What is the date and time of arrest?

A. This states its the 5th of February, 1985 at 1300 hours which is 1 o'clock in the afternoon.

* * *

Q. Do you know whose responsibility it was to prepare the arrest report?

A. It could have been any of our responsibility. Primarily mine."

Detective Miller was then shown a two-page supplemental report which stated that the defendant was taken "into custody" on February 5, 1985. Detective Miller then testified:

"Q. Did you prepare that report?

A. Yes.

Q. You prepared that portion of it?

A. Yes.

Q. Mr. Green was in custody on February 5, 1985; is that correct?

A. In a manner of speaking.

Q. Yes or no, was he in custody?

A. Yes he was."

One might have thought that Detective Miller would have been unable to extricate himself from the strictures of his own reports, but he was equal to the task, and in doing so proved himself a master contortionist of the English language:

"Q. Detective Miller what do you mean when you say in a manner of speaking he was in custody on February 5, 1985 referring to Charles Green?

A. *He was in the police presence in a police facility.*"

Unquestionably no decision in the entire history of the United States Supreme Court, at least in the constitutional-criminal sphere, is as well known as *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602, 1612, which holds:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *** Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

I am of course aware of the United States Supreme Court decision in *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285. In *Elstad*, the police were investigating a burglary and went to the defendant's home. In the living room of the home, with defendant's mother in the kitchen, the officer asked the defendant, without first giving the defendant his *Miranda* warnings, whether the defendant knew a person by the name of Gross. When the defendant stated that he had heard that there was a robbery at the Gross house, the officer told the defendant that he felt the defendant was involved in the robbery, and the defendant stated "Yes I was there." (470 U.S. at 301, 84 L. Ed. 2d at 227, 105 S.

Ct. at 1289.) The defendant was then transported to the police station, advised of his *Miranda* rights, and subsequently gave a full confession. Under these facts the Supreme Court held that the failure to give the defendant *Miranda* warnings in the defendant's home did not taint the subsequent confession made after the defendant was advised pursuant to *Miranda v. Arizona.* I believe the *Elstad* holding to be inapplicable to the present cause for two reasons. *First,* it is obvious to me that the defendant's statements on February 5 and 6, 1985, in the police station prior to his appearance before the grand jury—again, the record does not reflect what those statements were—were involuntary. The defendant was 16 years old, in strange, unfamiliar surroundings, questioned at length by adult (police and assistant State's Attorney) strangers about brutal homicides, not advised of any constitutional guarantees, his mother denied the right to see him, not provided with counsel, juvenile officer, or taken before a court. The Supreme Court has held that the lack of *Miranda* warnings is "a significant factor" in determining the voluntariness of a confession. (*Davis v. North Carolina* (1966), 384 U.S. 737, 740, 16 L. Ed. 2d 895, 898, 86 S. Ct. 1761, 1764.) The following language from the recent unanimous holding of the United States Supreme Court in *Crane v. Kentucky* (1986), 476 U.S. 683, 687-89, 90 L. Ed. 2d 636, 643-44, 106 S. Ct. 2142, 2145-46, is directly applicable:

> "It is by now well established that 'certain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.' *Miller v. Fenton* (1985), 474 U.S. 104, 109, 88 L. Ed. 2d 405, 410, 106 S. Ct. 445, 449. * * *
> * * *
> * * * [T]he circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal and one factual. The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness * * *. [Citation.] But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence."

It must also be kept in mind that the burden of proving that a confession was voluntary is on the State. (Ill. Rev. Stat. 1985, ch.

38, par. 114—11(d).) Even if Detective Miller's testimony were to be credited that he told the defendant that he was free to leave, if Miller had told the defendant this, he would, of necessity be stigmatized as "remiss" in his duties, according to the State's brief filed in this court. This case at bar

> "presents a clear picture of an officer attempting to turn a custodial interrogation into a noncustodial one by repeating a litany that the defendant was free to leave. It is apparent that even one of defendant's mentality would have felt the opposite; he knew that he had made an oral confession; it belies all human experience to say that in that posture the authorities would lose interest in the case. *Miranda* warnings should have been given. The purpose and flagrancy of official misconduct are apparent. *People v. Smith* (1980), 91 Ill. App. 3d 438, 414 N.E.2d 1281, *rev'd on other grounds* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325." *People v. Berry* (1984), 123 Ill. App. 3d 1042, 1046, 463 N.E.2d 1044, 1048.

Two recent cases have distinguished *Elstad* on this basis. In *In re T.S.* (1986), 151 Ill. App. 3d 344, 502 N.E.2d 761, the defendant, a 15 year old, made an oral confession without benefit of *Miranda* warnings. Later, the statement was typed, defendant was warned of his *Miranda* guarantees, and he signed the statement. The written statement which was given immediately after the unwarned oral statement was a "mere reiteration" of the oral statement. As in the case at bar, the defendant was taken to a police station alone in a squad car; he was not accompanied by his parents or an attorney during the interrogation at the police station; although he was initially informed he was free to go, he testified that he did not really believe that this was true. In distinguishing *Oregon v. Elstad*, the court in *In re T.S.* held:

> "There are several significant distinctions between *Elstad* and the case at bar. First, in *Elstad*, the respondent's warned confession was preceded by an unwarned yet volunteered remark. Here, however, defendant's warned written confession was preceded by an unwarned oral confession. Further, the written confession here was, by the detective's own admission, a 'mere reiteration' of the previous oral confession. Second, *Elstad* involved a 'simple failure to administer *Miranda* warnings, unaccompanied by "any actual coercion" or other circumstances calculated to undermine the suspect's ability to exercise his free will.' In the present case, however, there is a

considerable amount of unrefuted evidence which would suggest coercion and intimidation. Third, unlike in *Elstad*, respondent's written statement here immediately followed his full, detailed oral statement. From an examination of the 'surrounding circumstances and the entire course of police conduct' with respect to both of respondent's statements, we conclude that the manner of interrogation was coercive. (*Oregon v. Elstad* (1984), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.) Further, due to the coercion and improper tactics used in obtaining an unwarned oral statement, the administration of *Miranda* warnings immediately prior to the written statement did not cure the condition that rendered the oral statement inadmissible." 151 Ill. App. 3d at 353.

In *People v. Hagar* (1987), 160 Ill. App. 3d 370, 513 N.E.2d 628, the defendant, 17 years old, was questioned by DCFS investigators. The DCFS investigator testified that under Department policy and State law he, as a DCFS investigator, was not required to give *Miranda* warnings to an arrestee. The defendant's statement to the DCFS investigator was made in a custodial environment at the DCFS Office, not at the defendant's home. After giving both an oral and written statement to the DCFS investigators, the defendant was then questioned by sheriff's investigators who did give the defendant *Miranda* warnings. After a 45-minute interview the defendant made a statement of his guilt to the Sheriff investigators. The *Hagar* court held that the second statement to the sheriff's investigators, though preceded by *Miranda* warnings, was inadmissible, distinguishing *Oregon v. Elstad* on the ground that the unwarned previous statement to the DCFS investigators was not voluntary.

I cannot accept the proposition that the *Elstad* holding may be converted into a license to induce an arrestee to make incriminating statements. Unlike *Elstad*, the failure to administer *Miranda* warnings here was a deliberate authoritative scheme calculated to permit the police and State's Attorney to interrogate a juvenile who was purposely kept ignorant of his constitutional guarantees. Then, once having obtained incriminating statements, the defendant was advised of his *Miranda* warnings, and repeated those incriminating answers before the grand jury which subsequently indicted him.

It is thus revealed that, to use another well-worn metaphor, the State played "cat and mouse" with the constitutional guarantees of this unrepresented boy right up to the end. *Oregon v. Elstad* clearly stands for the proposition that the mere inadvertent failure of the

police to advise the defendant of his *Miranda* rights does not forever contaminate defendant's statements after he has been given the appropriate warnings. However, the correct rule to be applied in the case of deliberate police deception was that announced more recently in *Maine v. Moulton* (1985), 474 U.S. 159, 176, 88 L. Ed. 2d 481, 496, 106 S. Ct. 477, 487, where the court said:

"Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. [Citation.] *However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.* Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." (Emphasis added.)

If this deceptive practice gained approbation from the courts the desiccation of *Miranda v. Arizona* would be complete. I have simply seen no authority which remotely approves such contradictory and diabolical stratagems.

## VII

### CONCLUSION

In sum, there simply is no authority from any jurisdiction of which I am aware which permits the police to arrest a 16-year-old boy in his home, take him to the police station, deny his mother permission to speak to him, purposely keep him in ignorance of his constitutional guarantees to counsel, silence and against self-incrimination, hold him for 27 hours, not take him before a juvenile police officer or a court as the State statutes require, but instead, take him before a grand jury, and without benefit of counsel, elicit self-incriminatory statements from him which constitute not only the evidence upon which the *same* grand jury indicted him, but also constitutes the only evidence which convicted him at trial. The procedure shown by this record to have been employed by representatives of the State of Illinois sworn to uphold the Constitution and the statutes of the State of Illinois flagrantly and abusively violated Charles

Green's constitutional and statutory rights.

Horrible, despicable atrocities were inflicted upon the victims in the case at bar. Horrible, despicable atrocities were likewise inflicted upon the constitutional rights of this defendant. But the former never justifies the latter. The majority opinion fully sets forth the former. I have similarly endeavored herein to reveal the latter, in part, because I am firmly convinced that a sure protection of constitutional freedoms is an adequate exposure of their violations. Accordingly, I vigorously dissent from the affirmance of the defendant's convictions.

## ADDENDUM TO ORIGINAL DISSENTING OPINION ON DENIAL OF DEFENDANT'S PETITION FOR REHEARING.

If there existed a molecule of doubt that the assessment in my dissenting opinion of appointed counsel's performance as grossly deficient was perhaps too harsh, counsel's "Petition for Rehearing" has obliterated every iota of uncertainty. I went to considerable length in my dissenting opinion to point out that the record on appeal was incomplete and in considerable disorder. I had hoped, even expected, that defendant's appointed counsel would have made a conscientious attempt to rectify this situation. Instead, defendant's appointed counsel has done nothing.

Additionally, defendant's counsel's "Petition for Rehearing" fails to discuss or even mention the inconsistent positions taken by the State in the trial court and in this court on the defendant's motion to suppress. Nor does it discuss the confusing and incoherent "findings" of the trial court in denying the defendant's motion to suppress. The petition for rehearing does not discuss the impropriety of the trial judge's consideration and reliance upon the testimony of James Davis, given in a totally different trial court proceeding to which this defendant was not a party or even present, in denying the defendant's motion to suppress.[5]

Most egregious of all is the failure of the defendant's appointed counsel to even mention in the defendant's petition for rehearing the gross impropriety of the assistant State's Attorneys taking this

---

[5]I note that recently one of our sister courts has specifically ruled that it was error for the trial court to rely upon former testimony, even when given on the defendant's *own* motion to suppress. See *People v. Brown* (1989), 177 Ill. App. 3d 671, 673, 532 N.E.2d 547.

unrepresented youth before a grand jury, extracting thereat a self-inculpatory statement from him; adroitly sidetracking a grand juror's questioning of the defendant; and then prosecuting the defendant on an indictment returned by the same grand jury and using the defendant's unconstitutionally procured grand jury testimony to convict him. Perhaps appointed counsel's failure to cite *Boone v. The People* (1894), 148 Ill. 440, 36 N.E. 99, in his original brief is explainable by and attributable to the longevity of *Boone*. No subsequent State's Attorney (as far as I am able to determine) has since the advent of *Boone* attempted such despicable tactics and, therefore, perhaps counsel's research failed to uncover *Boone*. But appointed counsel's failure to discuss *Boone* and its applicability in defendant's petition for rehearing, now that counsel has been made aware of *Boone* by my dissent, is so grossly derelict that I can only conclude that justice and due process demand that different counsel be appointed and defendant given an opportunity to fairly litigate the issues in his case with the benefit of and by competent representation.

I stress again that involved in this cause is a minor, of limited education, unsophisticated in legal matters, and ignorant of his constitutional and statutory rights. When I read appointed counsel's lead brief and compared it to what the record on appeal revealed, my original belief was that counsel either did not know or did not care about the legal issues involved in this defendant's highly unusual appeal. But after reading his petition for rehearing, it has become obvious to me that the alternatives have been narrowed to the latter.

Also egregious is the petition for rehearing's failure to rely on, argue, discuss or even mention the State's inconsistent positions in the trial court that: (1) the officers *did not* have probable cause to arrest the defendant; and (2) the defendant was not under arrest (a) when the officer took him from his home on February 5, 1985, (b) during the defendant's 27-hour, incommunicado overnight stay at the police station, (c) during which his mother was refused permission to see him, and (d) when he was thereafter taken before the grand jury, with the State's contrary positions, taken for the first time, before this court of review, that: (1) the officers *did* have probable cause for the defendant's arrest; (2) the officers *did* arrest the defendant in his home on February 5, 1985; and (3) that the defendant *was* thereafter under arrest. The majority in the case at bar is conspicuously silent on and makes absolutely no mention of these legally impermissible inconsistencies by the State. Thus, the majority has not only inconspic-

uously, but improperly, allowed the State to change horses in the middle of the stream between the trial court and the appellate court upon learning that the horse it was riding could not carry it to the desired affirmance shore, but additionally, the majority has also, but just as improperly and equally as inconspicuously, allowed the State to mount an inconsistent and different horse and ride in an inconsistent and different stream, in an inconsistent and different direction to an inconsistent and different affirmance shore.

I am constrained to point out the recent decision of this court in *People v. Walker* (1988), 177 Ill. App. 3d 743, 532 N.E.2d 447. Walker filed a motion to suppress evidence which was denied by the trial court. In his motion to suppress, Walker urged that his warrantless arrest in his home was illegal. On his appeal the State, *for the first time,* urged that the officer's entry into Walker's home was with the consent of Walker's mother. Serendipitously, the *Walker* appeal was heard by the identical panel of justices who heard the instant appeal. Moreover, the same justice authored both the majority opinions in *Walker* and in the instant appeal, and the same justice concurred in both. I have dissented in both. In *Walker,* the majority wrote:

> "It appears that the State raised the question of a consensual arrest for the first time on appeal. A prevailing party may raise, in support of a judgment, any reason appearing in the record [citation], *although this rule does not apply when the new theory is inconsistent with the position adopted below* or the party has acquiesced in contrary findings. [Citation.] The record in the court below disclosed that the initial hearing revolved around probable cause to arrest rather than the consensual nature of the entry. *The State did not argue in the trial court a theory inconsistent with its position in this court.* Therefore, we find no basis in the record to reverse the trial court's denial of defendant's motion to suppress even though the consent issue was first argued on appeal." 177 Ill. App. 3d at 746, 532 N.E.2d at 448-49. (Emphasis added.)

I dissented in *Walker* and asserted, *inter alia,* that the State should not be permitted to rely upon a ground on appeal, *i.e.,* consent, different from the ground upon which it relied in the trial court, *i.e.,* probable cause, to validate a warrantless arrest. As I read the majority's decision in *Walker,* the rule announced therein is that the State may assert a different theory on appeal when *"[t]he State did not argue in the trial court a theory inconsistent with its position in this court,"* and provided the *"new [appeal] theory is [not] in-*

*consistent with the position adopted below.*" (177 Ill. App. 3d at 746, 532 N.E.2d at 448.) Yet, in the instant cause the positions urged by the State on appeal are not merely "inconsistent"—they are antagonistic and diametrically opposite, by 180 degrees, to the positions urged by the State in the trial court. As stated, in the instant cause the State asserted in the trial court that the officers did not have probable cause for the defendant's arrest and that the defendant was not arrested in his home, at the police station, or at all; whereas on appeal the State conversely urges, for the first time, that the officers had probable cause for the defendant's arrest and that the officers arrested the defendant in his home.

The majority opinion in *Walker* and the majority opinion in the instant cause cannot be reconciled. Even a precise reader will fastidiously peruse the majority opinion in the instant cause in vain to discern that the State urged on appeal a new theory "*inconsistent with the position adopted below,*" to avoid the majority's *Walker* ruling, as quoted above. The majority in the instant case says absolutely nothing on this issue. At least in *Walker* the majority faced the State's double-dealing, made a decision and rendered its ruling. However, here, where the facts *incontestably* establish that the State has violated the majority's *Walker* ruling, the same majority is completely silent.

With all due deference, this is unfair and misguiding not only to the defendant, but to the entire bench and bar. Trial juages as well as litigators look to published appellate court opinions not only as the law in the particular cases, but also as guideposts and touchstones for future cases and controversies. While reasonable men and women may disagree on the *limits* of *stare decisis*, certainly *stare decisis* does have *some* rule to play in our judicial system. Surely some fidelity to consistency is owed. The majority opinions in *Green* and *Walker* are irreconcilable. Certainly if this court is going to create such a drastic legal change of such gigantic proportions between *Green* and *Walker, i.e.,* permit the State to "sandbag" a defendant by switching adverse theories between the trial and appellate courts in order to affirm a conviction, this court ought to say so forthrightly and in no uncertain terms.

I would grant the petition for rehearing and appoint other counsel to represent the defendant.